No. 22-1166
_____

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT
_____


**Micah Uetricht and John Kaderbek,**

Plaintiffs-Appellants,

v.

**Chicago Parking Meters, LLC,**

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Illinois,
Case No. 1:21-CV-03364
The Honorable Matthew F. Kennelly

_____

## OPENING BRIEF OF
## PLAINTIFFS-APPELLANTS
_____

DESPRES, SCHWARTZ & GEOGHEGAN, LTD.          CHANEN & OLSTEIN
Thomas H. Geoghegan (*counsel of record*)    Stuart J. Chanen
Michael P. Persoon                           Ariel Olstein
Willem Bloom                                 7373 N. Lincoln Ave.
77 West Washington Street, Suite 711         Suite 100
Chicago, Illinois 60602                      Lincolnwood, IL 60712
(312) 372-2511                               (847) 469-4669

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1166

Short Caption: Michah Uetricht, et al. v. Chicago Parking Meters, LLC

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Plaintiff-Appellants Micah Uetricht and John Kaderbek

The only new information on this form is counsel's appearance for Plaintiff-Appellants.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Despres, Schwartz, & Geoghegan, Ltd.

Chanen & Olstein

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

n/a

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Thomas H. Geoghegan    Date: 04/08/2022

Attorney's Printed Name: Thomas H. Geoghegan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☑ No ☐

Address: 77 W. Washington St., Suite 711, Chicago, IL 60602

Phone Number: (312) 372-2511    Fax Number: (312) 372-7391

E-Mail Address: tgeoghegan@dsgchicago.com, admin@dsgchicago.com

rev. 12/19 AK

i

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1166

Short Caption: Micah Uetricht, et al. v. Chicago Parking Meters, LLC

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 Plaintiff-Appellants Micah Uetricht and John Kaderbek

 The only new information on this form is counsel's appearance for Plaintiff-Appellants.

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Despres, Schwartz, & Geoghegan, Ltd.

 Chanen & Olstein

(3)      If the party, amicus or intervenor is a corporation:

   i)        Identify all its parent corporations, if any; and

 n/a

   ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

 n/a

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 n/a

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 n/a

Attorney's Signature: /s/ Michael P. Persoon          Date: 04/08/2022

Attorney's Printed Name:  Michael P. Persoon

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).      **Yes**  ☐   **No** ☑

Address: 77 W. Washington St., Suite 711, Chicago, IL 60602

Phone Number: (312) 372-2511          Fax Number: (312) 372-7391

E-Mail Address: mpersoon@dsgchicago.com, admin@dsgchicago.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1166

Short Caption: Michah Uetricht, et al. v. Chicago Parking Meters, LLC

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Plaintiff-Appellants Micah Uetricht and John Kaderbek

The only new information on this form is counsel's appearance for Plaintiff-Appellants.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Despres, Schwartz, & Geoghegan, Ltd.

Chanen & Olstein

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

n/a

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Will W. Bloom          Date: 04/08/2022

Attorney's Printed Name:  Will W. Bloom

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address:  77 W. Washington St., Suite 711, Chicago, IL 60602

Phone Number: (312) 372-2511          Fax Number:  (312) 372-7391

E-Mail Address: wbloom@dsgchicago.com, admin@dsgchicago.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-1166

Short Caption: Micah Uetricht, et al v. Chicago Parking Meters, LLC

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Plaintiff-Appellants Micah Uetricht and John Kaderbek

The only new information on this form is counsel's additional appearance for Plaintiff-Appellants.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Despres, Schwartz and Geoghegan Ltd. (appearance already on file)

(3)     If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Stuart Chanen     Date: 2/28/2022

Attorney's Printed Name: Stuart J. Chanen

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address: Chanen & Olstein 7373 Lincoln Ave, Suite 101 Lincolnwood, IL 60712

Phone Number: 847-469-4669     Fax Number: 847-469-4669

E-Mail Address: Stuart@ChanenOlstein.com (Hannah@ChanenOlstein.com)

rev. 12/19 AK

iv

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-1166

Short Caption: Micah Uetricht, et al v. Chicago Parking Meters, LLC

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Plaintiff-Appellants Micah Uetricht and John Kaderbek

    The only new information on this form is counsel's additional appearance for Plaintiff-Appellants.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Despres, Schwartz and Geoghegan Ltd. (appearance already on file)

(3)    If the party, amicus or intervenor is a corporation:

      i)    Identify all its parent corporations, if any; and

          N/A

      ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Ariel Olstein        Date: 2/28/2022

Attorney's Printed Name: Ariel Olstein

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address: Chanen & Olstein 7373 Lincoln Ave, Suite 101 Lincolnwood, IL 60712

Phone Number: 847-469-4669        Fax Number: 847-469-4669

E-Mail Address: Ariel@ChanenOlstein.com (Hannah@ChanenOlstein.com)

rev. 12/19 AK

v

## TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS.....................................................i

TABLE OF CONTENTS...........................................................................................vi

TABLE OF AUTHORITIES ................................................................................. viii

JURISDICTIONAL STATEMENT .......................................................................... x

STATEMENT OF THE ISSUES.............................................................................xi

STATEMENT OF THE CASE...................................................................................1

    I.   Introduction ...............................................................................................1

    II.  Facts Surrounding the Creation of a Monopoly ........................................2

SUMMARY OF ARGUMENT...................................................................................6

ARGUMENT ...........................................................................................................7

    I.   Defendant CPM as a private entity is not entitled to *Parker* immunity for a 75-year, unregulated, for-profit monopoly conferred on it by the City to operate the city's parking meter system. ...............................................................................................7

    II.  The Court misread the decision in *Hallie v. Eau Claire* as not requiring "active regulation" when a municipality but not the State confers a monopoly on a private party......................................11

    III. There is no "clear articulation" in Illinois law that authorizes a municipality to give a private entity the exclusive right to rent curb space on the public streets and ways. ........................................15

CONCLUSION........................................................................................................19

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE LIMITATIONS ......................................................................................................21

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(a) and (b) ........................................................................................................................22

SHORT APPENDIX.......................................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Active Waste Disposal, Inc., v. City of Darien,*
635 F.3d 883 (7th Cir. 2011) ..............................................................................17

*California Retail Liquor Dealers Ass'n v. Midcal Aluminum Inc.,*
445 U.S. 97 (1980) ...................................................................................*passim*

*Chamber of Commerce of the United States v. City of Seattle,*
890 F.3d 769 (9th Cir. 2018) ........................................................ 13, 15

*City of Lafayette v. Louisiana Power & Light Co.,*
435 U.S. 389 (1978) ...............................................................................10

*Community Communications v. Boulder,*
455 U.S. 40 (1982) .................................................................................10

*FTC v. Phoebe Putney Health Systems*
568 U.S. 216 (2012) ..............................................................12, 15, 17

*FTC v. Ticor Title Ins. Co.,*
504 U.S. 621 636 (1992) ....................................................................17

*Hallie v. City of Eau Claire*
471 U.S. 34 (1984) ......................................................................*passim*

*N. Carolina State Bd. of Dental Examiners v. F.T.C.,*
574 U.S. 494 (2015) ..............................................................12, 13, 15

*Parker v. Brown,*
317 U.S. 341 (1943). ...................................................................*passim*

*Poole v. Kankakee,*
94 N.E.2d 416 (1950) ...........................................................................16

## Statutes

15 U.S.C. § 1 .............................................................................5, 7, 8, 16

15 U.S.C. § 2 ..................................................................................5, 7, 8, 17

15 U.S.C. § 16 .......................................................................................... 8

65 ILCS 5/11-71-1 .............................................................................*passim*

65 ILCS 5/11-80-2 ........................................................................ 7, 16, 18

65 ILCS 5/11-80-20 ...................................................................... 7, 16, 18

815 ILCS 805 ............................................................................................ 5

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 for claims arising under Sherman Act, 15 U.S.C. §§ 1 and 2.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 as it is an appeal from a final judgment of the United States District Court for the Northern District of Illinois disposing of all parties' claims. The District Court entered judgment on January 24, 2022. Plaintiffs-Appellants filed the notice of appeal on February 1, 2022.

## STATEMENT OF THE ISSUES

1.   Did the District Court err in granting Defendant's motion to dismiss?

2.   Did the District Court err in holding that Chicago Parking Meters, LLC ("CPM") a private, for-profit corporation, had *Parker* immunity from antitrust law, based on immunity that is provided to municipalities under *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, (1984)?

3.  Did the District Court err in holding that there was a clear articulation of State approval of the City of Chicago's arrangement with CPM based on a state law that discusses only *off-street* parking instead of *on-street* parking?

## STATEMENT OF THE CASE

### I.     Introduction

This appeal is focused on two particular issues in the District Court's decision, both related to the conditions required for a private entity to enjoy *Parker* antitrust immunity under *California Retail Liquor Dealers Ass'n v. Midcal Aluminum Inc.*, 445 U.S. 97 (1980). Other than those two issues, the District Court's decision was correct. It correctly determined that Plaintiffs have standing to bring this lawsuit, having sufficiently alleged a material injury. It correctly determined that Plaintiffs alleged a valid antitrust injury, holding that the increase in parking meter rates satisfies the standard for an antitrust injury. It is only on the issue of state action immunity that the District Court erred.

The District Court made two important errors on the question of state action immunity. First, it misunderstood the holding of *Hallie v. City of Eau Claire*, 471 U.S. 34 (1984), a case in which the Supreme Court held that where a State grants a monopoly to a municipal government, that monopoly does not require the same active regulation that is required for private entities to enjoy state action immunity. The District Court misread that holding to mean that a private entity granted a monopoly by the government was also exempted from the requirement for active regulation, despite the *Hallie* Court explicitly stating that the municipality exception it was creating did not apply to a private entity.

1

Second, the District Court misunderstood an Illinois statute, 65 ILCS 5/11-71-1 ("Division 71"), that involves advertising agreements related to off-street parking. Defendant-Appellee argued below, and the District Court agreed, that Division 71 constituted a clear articulation of state policy necessary for antitrust exemption under *Midcal*. This was error. A completely different part of the Illinois Code governs on-street curbside parking, and Division 71 does not provide any support for a state policy in favor of private control of curbside parking, much less a clear articulation of such a policy. That standard, which is quite high and goes beyond general grants of authority to regulate, is certainly not met by the statute on which the District Court relied below.

For both of these reasons, we ask this Court to reverse the decision of the District Court and remand for further proceedings.

## II.    Facts Surrounding the Creation of a Monopoly

In 2008, the City of Chicago and Chicago Parking Meters, LLC ("CPM") a privately owned company, entered into the "Parking Meter Concession Agreement," which was modified in 2013 (collectively, the "Agreement"). Appx. A26-A235.

Under the Agreement, the City of Chicago has conferred a private monopoly on CPM—for 75 years—to rent all of Chicago's "Metered Parking Spaces," provide all the "Metered Parking Spaces," and operate the City's "Metered Parking System." See Agreement § 1.1 (Appx. A35-A62). First Amended Complaint ¶1 (Appx.

A11). Under the Agreement, CPM receives the revenue from these Metered Parking Spaces, which are fixed in number, at rates which were doubled pursuant to the Agreement. The Agreement has a term of 75 years and may not be modified, re-bid, or terminated for the better part of a century without full payment for any loss of the value of the Agreement to CPM, as determined in arbitration. The payment required from the City for any significant change or termination of the Agreement is beyond the ability of the City to pay, or it is not reasonable to pay the Agreement also keeps increasing in value to CPM. While CPM originally paid $1.1 billion for the Agreement in 2008, CPM last year had already recovered that full amount and at least $500 million or more in additional to the recovered original investment, with an additional 60 years of monopoly profit still to come. First Amended Complaint ¶¶18-20 (Appx. A15).

As set forth the First Amended Complaint, the Plaintiffs, as licensed drivers in the City of Chicago, brought this action because the cost of metered parking in Chicago has, as a direct result of the agreement with CPM, become exceedingly high. Plaintiffs and other drivers have no alternative to regular or period payment of these meter rates to CPM when they use cars for shopping, recreation, or personal needs in commercial areas of the City. First Amended Complaint ¶¶17, 37 (Appx. A15, A18).

In addition to the higher rates, the CPM Agreement deprives Plaintiffs of the benefits of the City's active regulation of the streets and public ways for the public good. Because the City must make whole CPM for any loss of revenue from any change or alteration of the location of meters, the City is significantly inhibited from using its regulatory power even for minor adjustments, including reducing parking spaces in high crash areas or otherwise eliminating spaces to ease congestion. Likewise, the City is inhibited from increasing the number of bike lanes and exclusive bus lanes because of the cost of reimbursing CPM for loss of its monopoly profit. Even to make modest changes in the location of parking meters, or hold special events, the City of Chicago has had to pay $28 million in so called "true-up" payments to CPM. First Amended Complaint ¶¶24, 31, 33, 43 (Appx. A16, A17, A19).

The City itself is also barred from competing with CPM through the City's existing ownership of off-street parking lots and garages. For example, Agreement Section 3.12 requires that the cost of off-street parking be no less than three times higher than the highest on-street meter rate being collected by CPM in that area. Appx. A82.

Having prevented the emergence and competitiveness of alternatives, CPM has raised prices significantly. Meters in Chicago cost double what they did when the Agreement was signed 14 years ago. With the exception of New York City,

Chicago drivers pay the highest average rates for short term on-street parking of any U.S. city over 100,000 residents. Yet the Agreement bars any re-bidding for a 75-year period by any party offering better terms, including active supervision by the City, unless the City pays billions and billions of dollars to terminate it.

On June 23, 2021, Plaintiffs brought this challenge to the CPM under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and § 2. Plaintiffs also brough a claim under the Consumer Fraud and Deceptive Practices Act, 815 ILCS 805. After Plaintiffs filed a First Amended Complaint, the Defendant CPM moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The District Court granted the motion to dismiss. While the District Court ruled that Plaintiffs had standing and had defined a relevant market and an antitrust injury, the District Court found that Defendant CPM, a private entity, could invoke judicial immunity to the antitrust laws available to state government under *Parker v. Brown*, 317 U.S. 341 (1943). The District Court found that the delegation to a private entity met the test of *California Retail Liquor Dealers' Ass'n. v Midcal Aluminum, Inc.*, 445 U.S. 97 (1980). Specifically, the District Court found that a state law relating to off-street parking authorized the creation of a private monopoly for on-street parking. In addition, the District Court held that neither the State nor the City had to actively regulate a private monopoly like CPM because the City created it and not the State. Finding that CPM was entitled to *Parker* immunity from the antitrust laws, the Court dismissed

5

Counts I and II and declined to exercise supplemental jurisdiction over Count III, the state law claim.

Plaintiffs filed this appeal on February 1, 2022.

## SUMMARY OF ARGUMENT

In dismissing this action for failure to state a claim, the District Court erred in finding that a private for-profit monopoly of 75 years over rental of curb space on the public streets of Chicago—without any active supervision by the State or City—was entitled to state action immunity under *Parker v. Brown,* 317 U.S. 341 (1943) ("*Parker* antitrust immunity"). The Court erred.

Plaintiffs are entitled to proceed with their Sherman Act claims. In taking over the City's parking meters for most of a century, CPM, does not meet either condition for *Parker* antitrust immunity set out in *Cal. Retail Liquor Dealers' Ass'n v. Midcal Aluminum,* 445 U.S. 97, 105 (1980).

As to the first condition under *Midcal,* the District Court erred in relying on an inapplicable statute related to off-street parking, Division 71. Nor was the CPM's long-term control of the rates and number of meters on City streets a "foreseeable result" of a State's general grant of authority to act. See *Hallie,* 471 U.S. at 42. Likewise, the CPM 75-year monopoly over metered parking is not a foreseeable result of the State's general grant of authority to a municipality over its public streets in

65 ILCS 5/11-80-2 and 5/11-80-20, which the District Court erroneously failed to cite.

Nor does the Agreement meet the second *Midcal* condition of "active state supervision" by the State. Although the Supreme Court in *Hallie* created an exception to the active supervision requirement *for municipalities*, that exception applies only when the municipality itself is the sole actor and acting presumably in the public interest. The District Court erred in reading *Hallie* to excuse State supervision when a private entity like CPM is performing that function instead of the municipality. In *Hallie* itself, and in its later cases, the Supreme Court has been clear that there is no exception to active supervision by the State when a private entity is involved, or the municipality is not the sole actor. See, *e.g., Hallie,* 471 U.S. 34 at 46 n.10.

For these reasons, Plaintiffs seek reversal of the District Court's dismissal and judgment.

## ARGUMENT

**I.    Defendant CPM as a private entity is not entitled to *Parker* immunity for a 75-year, unregulated, for-profit monopoly conferred on it by the City to operate the city's parking meter system.**

Plaintiffs have brought this challenge to CPM under both Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and § 2. Although Plaintiffs have paid much higher meter rates and suffered economic injury from the CPM's monopoly, Plaintiffs

seek only injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 16, to terminate the CPM Agreement, and to allow the City to consider competitors that would offer more favorable terms at reasonable intervals. Plaintiffs do not seek damages under Section 15 of the Clayton Act.

Counts I and II of the First Amended Complaint reference different violations of the Sherman Act. Under Section 2, Plaintiffs challenge CPM for operating an exclusive private monopoly for a 75-year period; and Plaintiffs contend that in aid of this monopoly, there are artificial and unreasonable barriers to competition with CPM for 75 years. The unreasonable restrictions placed in the CPM Agreement to protect the monopoly bar the resumption of direct control by the City or re-bidding of the CPM Agreement at reasonable intervals to potential competitors that would offer more favorable terms for consumers and citizens with respect to an important public function, namely, the rental of curb space on public streets.

Under Section 1, Plaintiffs likewise allege that the CPM Agreement is an unreasonable restraint of commerce because of its extraordinary length, a term of 75 years, and because it forecloses competition with competitors that could offer different or better terms for the benefit of consumers, including a reduction in meter rates that are the highest in the country for cities of comparable size. The CPM Agreement also places conditions on the City's ability to compete with off-street parking even by requiring rates of off-street parking to be three times higher than

the rates for on-street meters in the vicinity. The better or more favorable terms that competitors might offer also include terms that give the City far more flexibility to remove meters, create more bus and bike lanes as well as pedestrian walkways, permit more street closures, and other terms that make it easier for consumers to drive safely, limit congestion, and offer more carbon-free alternatives for motorists like Plaintiffs who wish to have not only lower rates but more transportation options.

For all these reasons, the Plaintiffs challenge the CPM Agreement, with its 75-year term as an injury to competition, and seek a date to terminate the Agreement now, or make it terminable at will by the City, by striking the unreasonable 75-year term.

As a private entity, CPM is not entitled to immunity from these claims under the well-known state action exemption to the federal antitrust law established in *Parker v. Brown,* 317 U.S. 341 (1943). The state-action exemption, which is derived in part from the Eleventh Amendment, covers the State first of all, but also can extend to municipalities for activities that the State itself approved. It may also extend to private entities performing public-type functions, but only in circumstances that meet the two conditions set out for such exemption in *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum Inc.,* 445 U.S. 97 (1980). First, there must be a "clear articulation" of a state policy to authorize the anticompetitive conduct of

9

the private entity. The Supreme Court has held that a general grant of authority is not enough. See *Community Communications v. Boulder*, 455 U.S. 40, 56 (1982); *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389 (1978).

Second, there must be "active supervision" by the State of that private entity. In *Midcal, supra*, the Court denied *Parker* immunity and upheld an antitrust challenge to California's wine pricing system, which was carried out by private parties. The Court held that while the system was clearly authorized by the State and met the first condition, it failed to meet the second, because the state had not "actively supervised" the private parties carrying out the wine pricing system. *Id.* at 105-06.

 As set out below, the CPM Agreement and CPM's 75-year monopoly on on-street parking meet neither of the two conditions set out in *Midcal*.

First, there is no "clear articulation" in any Illinois law of a policy to authorize the kind of anticompetitive conduct in which CPM is engaged: there is only a general grant of authority for the municipality itself to regulate the streets and public ways. As shown in more detail below, in finding "clear articulation" of a state policy, the District Court relied upon a law relating to off-street parking that has no relevance here.

Second, there is no "active supervision" by the State or the City over CPM—either directly during the 75-year term of the Agreement or by permitting the City to have the Agreement re-bid or terminated after a reasonable interval.

For either of these reasons, the District Court erred in extending *Parker* immunity to CPM.

## II.   The Court misread the decision in *Hallie v. Eau Claire* as not requiring "active regulation" when a municipality but not the State confers a monopoly on a private party.

The District Court was in error when it misread the Supreme Court's decision in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1984) as not requiring "active supervision" by the State of a private, for-profit monopoly when a municipality and not the State itself has created that monopoly. For the purposes of the motion, the District Court accepted the factual allegation that neither the State nor the City was actively supervising CPM. The District Court erred, however, when it held that *Hallie* dispensed with that requirement for a private monopoly performing a municipal function.

The District Court is wrong: the Supreme Court held no such thing. In *Hallie*, the Court held that the State of Wisconsin did not have to "actively regulate" a municipality, the City of Eau Claire, when the municipality itself was doing what the State had authorized—in that case, running a sewage treatment plant. In *Hallie*, the municipality was the sole monopolistic actor. No private party was in control, or even part of the case at all.

The Supreme Court held that "active state supervision [of anticompetitive conduct] is not a prerequisite to exemption from the antitrust laws where the actor is

11

a municipality rather than a *private party.*" *Hallie,* 471 U.S. at 47 (emphasis supplied). In this case, the District Court misread this holding to mean that where a municipality delegates monopoly power to a private, for-profit entity, that entity need not meet the "active regulation" requirement. Opinion at 10 (Appx. A10), citing *Hallie*, 471 U.S. at 46. This misreading of *Hallie* reaches a conclusion that is in conflict with the decision itself. Indeed, in a footnote to the municipality exception, the Court made clear that, notwithstanding its holding that State regulation of an actual municipality is not required, "Where state or municipal regulation by a private party is involved, however, *active* state supervision must be shown, even where a clearly articulated state policy exists." *Hallie,* 471 U.S. at 46 n.10 (emphasis added).

As the Supreme Court subsequently explained in *FTC v. Phoebe Putney Health Systems*, 568 U.S. 216 (2012), "[U]nlike private parties, [public bodies] are not subject to the 'active state supervision' requirement because they have less of an incentive to pursue their own self-interest under the guide of implementing state policies."  *Id*. at 226. Three years later, in *N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 574 U.S. 494 (2015), the Court again explained why it had carved out a municipality exception in *Hallie*:

> *Hallie* explained that "[w]here the actor is a municipality, there is little or no danger that it is involved in a private price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals."

471 U.S., at 47 (emphasis deleted). *Hallie* further observed that municipalities are electorally accountable and lack the kind of private incentives characteristic of active participants in the market. See *id.,* at 45, n.9. Critically, the municipality in *Hallie* exercised a wide range of governmental powers across different economic spheres, substantially reducing the risk that it would pursue private interests while regulating any single field. See *ibid.*

*Id.* at 508. The Supreme Court then clearly held the need for "active supervision" of nominally public entities or any regulation under the effective control of "market participants," stating,

That *Hallie* excused municipalities from *Midcal* 's supervision rule for these reasons all but confirms the [active supervision] rule's applicability to actors controlled by active market participants, who ordinarily have none of the features justifying the narrow exception [applicable to municipalities] that *Hallie* identified."

*Id.*

In other words, where a municipality is the monopolistic actor being supervised by the state, *Hallie* stands for the proposition that active supervision is not required, but where a private party is the monopolistic actor being supervised by the state or municipality, *Hallie* stands for the proposition that active supervision "must be shown" for the state action immunity doctrine to apply. The Ninth Circuit reached this result in *Chamber of Commerce of the United States v. City of Seattle,* 890 F.3d 769 (9th Cir. 2018), concluding that the "[t]he involvement of private parties in municipal regulation renders this case ineligible for the municipality exception outlined in *Hallie.*" *Id.* at 788. The court further explained that the rule that

13

was "well-settled" in *Hallie* was that "*municipal actors* need not meet the active-supervision requirement," but when "*private actors* exercise substantial discretion in setting the terms of municipal regulation, 'active state supervision must be shown.'" *Id.* at 790 (emphasis added), *quoting Hallie* 471 U.S. at 46 n.10. The Ninth Circuit then reiterated that the municipality exception—the one on which the district court in this case erroneously relied—is wholly inapplicable because "[a]ll of the reasons justifying the *Hallie* exception [for municipalities] are eviscerated by the involvement of private parties in this case." *Id.* at 790.

In this case, as Plaintiff's Complaint clearly alleges, the City is not actively regulating CPM, or the City's Parking Meter System, which is now being run by CPM, nor is the State doing so. Indeed, the Agreement precludes such active regulation by the City. For $1.1 billion paid in 2008, CPM bought not just the meters, which have only relatively small value, but the right to be free of active regulation or significant changes in the fares, the number of spaces, and other uses of the Reserved Powers of the City for the public health and safety.

It would hardly make sense for *Parker* immunity to apply to a private party like CPM that neither the State nor the City is regulating at all, let alone actively regulating, as the case law requires. There is nothing in *Hallie* that allows a municipality to create such an unregulated private monopoly, which of course the State itself cannot do. After a detailed search, Appellant has not found any other case that

goes so completely against the holdings of *Hallie* footnote 10, *Phoebe Putney*, *Dental Examiners*, and the Ninth Circuit's holding in *Chamber of Commerce*, on the sole ground that a private actor, as here, is not required to establish active state supervision of its conduct to establish immunity.

Respectfully, the District Court erred when it conflated the distinct rules that apply when a municipality is the monopolistic actor and when a private party is the monopolistic actor. The Court wholly misapplied *Hallie* when it applied the municipality exception set forth in the body of *Hallie* instead of the clearly contrary private party rule set forth in *Hallie* footnote 10. This Court should of course follow the Supreme Court's *Hallie* footnote 10, *Phoebe Putney, Dental Examiners*, as well as the Ninth Circuit's opinion in *Chamber of Commerce*, and reverse the improper dismissal of Plaintiff's Complaint.

## III. There is no "clear articulation" in Illinois law that authorizes a municipality to give a private entity the exclusive right to rent curb space on the public streets and ways.

The District Court did acknowledge that there must be a "clearly articulated" Illinois law that authorizes the City of Chicago to give CPM a 75-year monopoly. Opinion at 8 (Appx. A8). But the District Court mistakenly relied on a statute, 65 ILCS 5/11-71-1, that concerns *off-street parking,* in parking lots or garages, and has nothing whatsoever to do with *on-street, metered parking.* Division 71—the statute which CPM cited for state authorization and on which the District Court relied—

is literally entitled, in large capital block letters: "OFF-STREET PARKING." Section 5/11-71-1 applies exclusively to "off-street parking," and none other. As set out in the statute's plain language, Section 5/11-71-1 authorizes a municipality to "[a]cquire by purchase or otherwise own, construct, equip, manage, control, erect, improve, extend, maintain, and operate motor vehicles *parking lot or lots, garage or garages… public off-street parking facilities . . .*" (emphasis supplied).

Illinois courts have recognized Section 5/11-71-1 as authorizing off-street parking, just as the statute says. See, *e.g., Poole v. Kankakee,* 94 N.E.2d 416, 418 (1950) (upholding constitutionality of a prior version of Division 71). However, when confronted with a challenge to a charge for *on-street* parking, the Illinois Supreme Court relied on the general grant of authority to municipalities to regulate traffic, now codified at 65 ILCS 5/11-80-20, and the right to regulate the streets, now codified at 65 ILCS 5/11-80-2.

Those two provisions have been in effect since the nineteenth century, even before there were cars; and—to say the least—they do not "clearly articulate" a policy that authorizes a private monopoly to perform these general regulatory functions, for private profit, for a period of 75 years. The City has the authority to enter exclusive contracts—after all, every contract is exclusionary by its very nature, and every contract of any duration has some anti-competitive effect. Section 1 of the Sherman Act does not prohibit contracts, or *reasonable* restraints of trade:

16

it prohibits unreasonable ones. Similarly, Section 2 does not prohibit all monopolies, but only monopolies that are being unfairly maintained with unreasonable barriers to competition.

The District Court's view, that under Illinois law, a municipality can enter a contract begs the question posed by the case law—namely, whether the State of Illinois clearly articulated a policy or adopted a state law, which had a 75-year private monopoly over the rental of public streets as a "foreseeable result." See *Phoebe Putney Health Systems, supra,* 568 U.S. at 227 (2013). In that case, the Supreme Court held that a general grant of state authority to act, which of course includes the power to contract, is not enough to authorize arrangements that would injure the competitive process. *Id.* at 228. In *Phoebe Putney,* the Court affirmed the principle that "state-action immunity is disfavored, much as are repeals by implication." *Id.* at 225 (quoting *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 636 (1992)). The Court held that a general grant of power to enact ordinances, or just a general power to act, is insufficient to meet the clear articulation test of *Midcal.* Rather the anticompetitive effect at issue must be a "foreseeable result" of a kind that the State "affirmatively contemplated." *Id* at 227.

This Court's decision in *Active Waste Disposal, Inc., v. City of Darien*, 635 F.3d 883 (7th Cir. 2011) is not to the contrary. In that case, this Court did nothing more than find authority for the City of Darien and other cities to enter exclusive contracts

for disposal of waste. While the contracts are not described, one can infer there was nothing especially unusual about them. Presumably, they were for a reasonable period, and there was no claim that the haulers were not subject to "active supervision," or that the haulers could prevent termination. A typical exclusive contract, one that is subject to active regulation and for re-bidding after a reasonable period, at least arguably raises no serious antitrust problem in the first place. It does not even require a state action exemption from antitrust laws.

But the Agreement at issue in this case is not just an "exclusive contract." It is a legal monstrosity, not reasonably foreseeable from either 65 ILCS 5/11-80-2 or 65 ILCS 5/11-80-20, let alone Section 5/11-71-1. Here, the City of Chicago has given CPM an unregulated 75-year monopoly depriving the City of its full regulatory authority over the streets and public ways not for three or four years, but rather, for close to a century. And it is an exclusive contract that is impossible to cancel unless the City pays billions and billions of dollars to do so, and although clearly in the billions, such payment can only be calculated under such a complex formula as to produce a sum too large to reasonably estimate here.

Plaintiffs have alleged far more than just an exclusive contract in connection with the City's power to regulate the streets and public ways; rather, they have alleged a delegation to a private party of an *unreasonable* restraint of trade by virtue of its 75-year term monopoly, one that is not just "natural" or due to some special

18

talent or acumen of CPM, but a completely rigged, politically-engineered monopoly of a public function that serves no competitive purpose. It is full of booby-trapped penalties like true-up payments to prevent not just supervision but the ordinary regulation of public streets that the General Assembly expected from municipalities, and it bars market entry or competition for three quarters of a century.

The relief sought here is not to deny the City the power to enter exclusive contracts, subject to supervision, and for reasonable periods, but rather—in order to comply with federal antitrust law—to strike the illegal term of 75 years from the City's Agreement with CPM, to declare that the Agreement has been reformed, and to provide the City the power to de terminate the Agreement at will without prospective penalty.

## CONCLUSION

The Agreement fails the two required *Midcal* conditions for *Parker* immunity when applied to a private party. Without any authorization from the state to do so, the City has accepted a one-time payment in exchange for letting CPM have its way without any active State supervision for three quarters of a century while also keeping in place the highest rates in the country for a city of comparable size. Nor does the Agreement meet the first condition of being sanctioned by a "clearly articulated" state policy in favor of turning over the control of city curb space to a private party. The CPM Agreement is not a "foreseeable" result of the City's

general authority over the streets and public ways, but a perversion or sale of that authority in return for a cash infusion to meet a temporary budget deficit. Far from being foreseeable, the CPM Agreement was unimaginable, even to legislators who may have had few illusions about Chicago politics. It is an unconscionable monopoly of a public function—barring any interference by competitors—and otherwise an unreasonable restraint of trade for a fixed term of 75 years.

For these reasons, Plaintiffs-Appellants ask this court to reverse the decision of the District Court and remand for further proceedings.

Dated: April 11, 2022                                    Respectfully submitted,


                                                         ___/s/ Thomas H. Geoghegan___
                                                         Attorney for Plaintiffs-Appellants

Thomas H. Geoghegan (*counsel of record*)
Michael P. Persoon
Willem W. Bloom
DESPRES, SCHWARTZ & GEOGHEGAN, LTD.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511

Stuart J. Chanen
Ariel Olstein
CHANEN & OLSTEIN
7373 N. Lincoln Avenue, Suite 100
Lincolnwood, IL 60712
(847) 469-4669

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE LIMITATIONS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 5,007 number of words, excluding the parts of the brief exempted by Fed. R. App. P. 37(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 13-point Book Antiqua type.

Dated: April 11, 2022                                    ___/s/ Thomas H. Geoghegan___
                                                        Attorney for Plaintiffs-Appellants

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(a) and (b)**

This brief complies with the requirements of Circuit Rule 30(a) and (b) in that it is being filed simultaneously with a "short appendix" containing the judgement or order under review and any other required materials.


Dated: April 11, 2022                                  ___/s/ Thomas H. Geoghegan___
                                                                          Attorney for Plaintiffs-Appellants

No. 22-1166

_____

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____


**Micah Uetricht and John Kaderbek,**

Plaintiffs-Appellants,

v.

**Chicago Parking Meters, LLC,**

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Illinois,
Case No. 1:21-CV-03364
The Honorable Matthew F. Kennelly

_____

## SHORT APPENDIX OF
## PLAINTIFFS-APPELLANTS

_____

DESPRES, SCHWARTZ & GEOGHEGAN, LTD.
Thomas H. Geoghegan (*counsel of record*)
Michael P. Persoon
Willem Bloom
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511

CHANEN & OLSTEIN
Stuart J. Chanen
Ariel Olstein
7373 Lincoln Ave.
Suite 100
Lincolnwood, IL 60712
(847) 469-4669

## SHORT APPENDIX TABLE OF CONTENTS

SHORT APPENDIX TABLE OF CONTENTS ............................................................24

DISTRICT COURT OPINION AND ORDER................................................................25

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICAH UETRICHT and** | ) | |
| **JOHN KADERBEK,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 3364** |
| | ) | |
| **CHICAGO PARKING METERS, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

This case concerns a 2008 agreement between the City of Chicago and Chicago Parking Meters, LLC (CPM) that grants CPM the exclusive right to operate and collect revenue from the City's metered parking spaces for a 75-year period (the Agreement). Micah Uetricht and John Kaderbek[1] have sued CPM, asserting claims under the Sherman Act and the Illinois Consumer Fraud Act (ICFA). They seek certification of a class action under Federal Rule of Civil Procedure 23(b)(2) and an injunction against CPM's enforcement of the Agreement until certain modifications to it are made. CPM has moved to dismiss, contending, among other things, that the plaintiffs lack standing, they fail to plead an antitrust injury, and their Sherman Act claims are barred by the state action immunity doctrine. For the following reasons, the Court dismisses the case based on state action immunity.

---

[1] The case was originally filed with three named plaintiffs, but the third plaintiff was dropped in the plaintiffs' first amended complaint after she moved away from Chicago.

**Background**

For the purposes of this motion, the Court takes all well-pleaded factual allegations in the plaintiffs' first amended complaint as true. The plaintiffs are car owners living in Chicago. They seek to represent a class of "all Chicago residents who are using the Metered Parking System." First Am. Compl. ¶ 52.

In 2008, CPM and the City entered into the Agreement under which CPM agreed to pay the City about $1.1 billion in exchange for the exclusive right to operate and collect revenue from the City's network of metered parking spaces (the Metered Parking System). The Metered Parking System comprises approximately 36,000 city-operated, metered parking spaces in business and commercial areas. The term of the Agreement is 75 years, during which it cannot be rebid or modified unless the City pays CPM the full value of the Agreement.

Under the Agreement, the City retains so-called "reserved powers" over the Metered Parking System. But it is prohibited from exercising these powers without compensating CPM for any financial losses that CPM may suffer as a result of the regulation. For example, the City may not "reduce rates, use peak pricing, remove meters to reduce congestion, put in 'drop off' zones, and eliminate safety hazards in high crash areas, without a determination and possible arbitration of the compensation due to CPM." *Id.* ¶ 27. According to the plaintiffs, the costs of reimbursing CPM for significant changes to the Metered Parking System are so high that City officials are reluctant to undertake these kinds of projects. They contend that CPM, because of its financial leverage over the City, possesses "*de facto* exclusive control over the Metered Parking System." *Id.*

The plaintiffs allege that they suffer three distinct injuries as a result of the Agreement. First, the plaintiffs allege that they are injured by higher metered parking fees. They contend that the fees for city-owned metered parking have doubled since the Agreement was executed and are now higher than the fees in every other major city in the United States other than New York. Second, the plaintiffs contend that the Agreement "deprives [them] of the benefits from active regulation of the public streets." *Id.* ¶ 4. Third, the plaintiffs allege that, by forcing the City to maintain the number of metered parking spaces, CPM has stunted the development of alternative transportation routes, like bicycle lanes and express bus lanes, promoting auto-dependency and increasing transportation costs.

As indicated, the plaintiffs request injunctive and declaratory relief. They ask the Court to declare that CPM and the Agreement violate sections 1 and 2 of the Sherman Act and the ICFA. They also ask the Court to "[e]njoin CPM from enforcing the Agreement unless and until CPM has modified that Agreement to permit active regulation by the City of the Metered Parking System and a reasonable termination date for such Agreement, as modified." *Id.* ¶ 66.

**Discussion**

The plaintiffs assert three claims. Count 1 is a claim for illegal monopolization in violation of section 2 of the Sherman Act. Count 2 is a claim for illegal restraint of trade in violation of section 1 of the Sherman Act. And Count 3 is an unfair practices claim under the ICFA. For reasons that will become apparent, the Court first addresses the arguments concerning the Sherman Act claims.

1.    **Standing**

Article III of the Constitution restricts the jurisdiction of federal courts to "Cases" and "Controversies." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Id.* On a motion to dismiss, it is the plaintiff's burden to "clearly allege facts demonstrating each element" of Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks omitted). He must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

As explained above, the plaintiffs allege three separate injuries that they contend establish their standing. The Court begins its analysis with the first alleged injury, increased metered parking fees. This is a financial injury of the type that easily meets the injury-in-fact requirement. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). The more difficult question is whether the plaintiffs have met the other two elements of standing: causation and redressability. Under the Agreement, CPM does not have direct control over the metered parking rates; rather, it is the City that has "the Reserved Power to establish and revise from time to time the Metered Parking Fees." Dkt. no. 22-1 at 58. Although the plaintiffs allege that CPM has *de facto* control over the metered parking rates, it is undisputed that CPM cannot directly change the rates. The plaintiffs' injuries are thus tied to CPM through the actions and decisions of the City, a separate actor that is not a party to this case.

4

Standing is "substantially more difficult" to establish "where a causal relation between injury and challenged action depends upon the decision of an independent third party." *California v. Texas*, 141 S. Ct. 2104, 2217 (2021) (quotation omitted). But it's not impossible. In such cases, the plaintiff can still establish standing by showing "that [the] third parties will likely react in predictable ways." *Id.*

In *Department of Commerce*, for example, the Supreme Court held that states had standing to challenge the inclusion of a citizenship question in the 2020 census because it was sufficiently likely that the inclusion of such a question would result in underreporting by noncitizen households, thereby decreasing the amount of federal funds distributed to the states. *Dep't of Commerce*, 139 S. Ct. at 2565. The Court rejected the government's argument that the states' alleged harm depended on the independent action of third parties choosing—against the law—to not respond to the census. *Id.* at 2566. The Court concluded: "Respondents' theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Id.*

In contrast, the Supreme Court found in *California v. Texas* that the state plaintiffs did not have standing to challenge the Affordable Care Act's individual mandate. *California v. Texas*, 141 S. Ct. at 2117. The states argued that the individual mandate would harm them by encouraging more individuals to enroll in state-operated programs, increasing the cost of these programs. *Id.* The Supreme Court found that the plaintiffs failed to show that individuals would likely sign up for state-operated programs due to the individual mandate, given that the mandate was unenforceable. *Id.* at 2118. It concluded that "neither logic nor intuition" supported the plaintiffs' causal

reasoning.  *Id.*

In this case, the plaintiffs plausibly allege that the "predictable effect" of the requested injunction would be that the City would decrease metered parking fees.  The plaintiffs cite relevant data from other major metropolitan areas, stating that, with the exception of New York residents, Chicagoans "pay the highest average rates for short term on-meter use for any U.S. city over 100,000."  First Am. Compl. ¶ 41.  Additionally, the plaintiffs allege that the Agreement prevents the introduction of cost-saving measures like off-peak pricing that are being implemented in other cities.  Although the City currently has nominal control over the metered parking rates, the plaintiffs contend, it is functionally precluded from exercising that control given the economic penalties that it would have to pay CPM to implement pricing changes of this sort.  The injunction the plaintiffs request would allow the City to more easily regulate the Metered Parking System and bring down metered parking rates to levels more in line with those of other major cities.

CPM contends that the plaintiffs cannot allege an injury from increased parking fees because they "must plead injury in relation to the relief they seek, and the relief sought has nothing to do with whether meter rates have gone up."  Def.'s Mem. at 1.  Not so.  As the Court has explained, the plaintiffs allege that the metered parking fees have increased because of the City's inability to effectively regulate the Metered Parking System.  The requested injunction would address this by prohibiting CPM from enforcing the Agreement until it has modified the Agreement to permit active regulation by the City.

For these reasons, the Court finds that the plaintiffs' alleged injuries from

6

increased metered parking fees are sufficient to confer standing.  The Court thus need not address whether they have standing based on the other two injuries they allege.

## 2.    Antitrust injury

The defendants next argue that the plaintiffs have failed to allege an antitrust injury.  To maintain a claim under the Sherman Act, the plaintiff must allege either (1) reduced output of goods or services or (2) higher prices for consumers.  *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992).  The plaintiffs' allegations regarding increased metered parking fees satisfy this requirement.  The Court rejects CPM's contention that only the City, and not CPM, controls meter pricing.  As previously discussed, the plaintiffs plausibly allege that CPM has *de facto* control over meter pricing under the terms of the Agreement.

The cases that CPM cites do not govern this case.  In *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 267 (7th Cir. 1984), two private parties disputed the rightful ownership of a patent.  The Seventh Circuit held that there was no antitrust injury because, regardless of who rightfully owned the patent, "the power over price that patent rights confer is . . . no greater than it otherwise would be just because the person exercising the rights is not the one entitled by law to do so."  *Id.* at 265.  This case differs from *Brunswick*, however, because it does not involve the transfer of a monopoly between two private parties.  Rather, this case involves the transfer of a state-authorized municipal program to a private contractor.  Because there are appreciable differences between a "monopoly" held by a municipality and one held by a private party, *Brunswick* does not control here.

*Alarm Detection Systems, Inc. v. Orland Fire Protection District*, 129 F. Supp. 3d

614, 636 (N.D. Ill. 2015), is similarly inapplicable.  Although the case, like this one, involved the transfer of a municipal monopoly to a private company, the court in *Alarm Detection Systems* concluded that the plaintiff failed to allege an antitrust injury because it admitted that it was able to compete for business after the private company took over. *Id.* at 635.  Here, on the other hand, the plaintiffs allege that CPM holds a monopoly over the Metered Parking System and is able to prevent competition in the market.

**3.    State action immunity**

The state action immunity doctrine shields state action from federal antitrust liability if the challenged conduct is "clearly articulated and affirmatively expressed as state policy."  *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980).  This immunity extends to a municipality if its "anticompetitive activities were authorized by the State pursuant to state policy to displace competition with regulation or monopoly public service."  *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38–39 (1985) (internal quotations omitted).  To be authorized by the state, the challenged conduct need not be compelled by the state's policy.  *Id.* at 45.  Rather, it is enough that the challenged action was a foreseeable result of the state's policy.  *Id.* at 42.

The Court concludes that state action immunity applies in this case.  The Illinois Municipal Code authorizes municipalities to "own, construct, equip, manage, control . . . and operate . . . parking meters."  65 ILCS 5/11-71-1(a).  It also permits municipalities to "[e]nter into contracts *dealing in any manner* with the objects and purposes of this Division 71, including the leasing of space on, or in connection with, parking meters for advertising purposes."  *Id.* at 5/11-71-1(c) (emphasis added).  The grant of an exclusive contract to operate city-owned parking meters is a foreseeable result of these

provisions.  *See Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 889 (7th Cir. 2011) ("In the context of municipal powers, it is generally understood that the authority to contract contemplates the power to create exclusive contracts.").

The plaintiffs read the Municipal Code differently.  They argue that subsection (a) of the Code "presumes that the City will at all times own and operate the parking meters on public streets" and that subsection (c) only authorizes the municipality to lease its rights to parking meters for advertising purposes.  Pls.' Resp. at 13.  This interpretation, however, is contrary to the text of the Code and state-law principles of statutory interpretation.  First, subsection (a) does not compel the City to own and operate the parking meters; it merely authorizes the City to do so if it so chooses.  Nothing in the text of the Code suggests that the City is required to own and operate parking meters on public streets.

Second, the text of subsection (c) specifically states that municipalities are authorized to enter into contracts "dealing in *any* manner" with the purposes of subsection (a).  65 ILCS 5/11-71-1(c) (emphasis added).  The plaintiffs argue that the phrase "including the leasing of space on . . . parking meters for advertising purposes" limits the City's authority under subsection (c) to advertising contracts.  The Court disagrees.  Although courts typically interpret general words in light of surrounding words,[2] this rule of construction "should not be used to . . . restrict the scope of the subjects the legislature intended to include within the act."  *Hagen*, 18 Ill. 2d at 178, 163 N.E.2d at 498.  The phrase "dealing in any manner" indicates that the legislature

---

[2] This principle is commonly referred to as "ejusdem generis."  *Hagen v. City of Rock Island*, 18 Ill. 2d 174, 178, 163 N.E.2d 495, 498 (1959).

9

intended to authorize municipalities to enter into a variety of different contracts. Adopting the plaintiffs' interpretation would improperly read this phrase out of the Municipal Code.  *See Lysek v. Elmhurst Dodge, Inc.*, 325 Ill. App. 3d 536, 542, 758 N.E.2d 862, 867 (2001) ("As a general rule, courts should avoid interpretations that treat language as surplusage and should instead attempt to give meaning to all of the words used.").

Lastly, the plaintiffs contend that, to avoid liability under the state action immunity doctrine, CPM must show that the Agreement is subject to active supervision by the City.  This supposed requirement, however, was rejected by the Supreme Court in *Town of Hallie*.  In the case, the Court made clear that "the active state supervision requirement should not be imposed in cases in which the actor is a municipality."  *Town of Hallie*, 471 U.S. at 42.

**4.      The ICFA claim**

Because the Court dismisses both claims under the Sherman Act, it declines to exercise supplemental jurisdiction over the ICFA claim.  *See Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 896 (7th Cir. 2001).  The ICFA claim is therefore dismissed for lack of subject matter jurisdiction.

**Conclusion**

For the foregoing reasons, the Court grants CPM's motion to dismiss [dkt. no. 24] and directs the Clerk to enter judgment dismissing Counts 1 and 2 of the plaintiffs' complaint with prejudice and Count 3 for lack of federal subject matter jurisdiction.

Date:  January 24, 2022                                    _____
                                                          MATTHEW F. KENNELLY
                                                          United States District Judge

10
