No. 22-1166

# In the United States Court of Appeals for the Seventh Circuit

---

MICAH UETRICHT AND JOHN KADERBEK,

*Plaintiffs-Appellants*,
v.
CHICAGO PARKING METERS, LLC,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois,
Case No. 1:21-cv-03364
The Honorable Matthew F. Kennelly

---

**BRIEF OF DEFENDANT-APPELLEE**

---

WINSTON & STRAWN LLP
Dan K. Webb
Robert Y. Sperling
Joseph L. Motto (*counsel of record*)
Conor Reidy
35 W. Wacker Dr.
Chicago, IL 60601
(312) 558-5600

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-1166

Short Caption: Uetricht, et al. v. Chicago Parking Meters, LLC

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   Chicago Parking Meters, LLC

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   Winston & Strawn LLP

(3)   If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and
           See attached Exhibit A

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
           See attached Exhibit A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
   Not applicable

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
   Not applicable

Attorney's Signature: /s/ Dan K. Webb                Date: 05/11/2022

Attorney's Printed Name:  Dan K. Webb

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  35 W. Wacker Drive

           Chicago, IL 60601

Phone Number:  (312) 558-5600                Fax Number:  (312) 558-5700

E-Mail Address:  DWebb@winston.com

rev. 12/19 AK

**EXHIBIT A**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the following disclosures are made on behalf of Chicago Parking Meters, LLC ("CPM") by counsel:

CPM is a limited liability company whose members include a corporation that is indirectly owned in part by Allianz SE, a publicly traded company, and limited partnerships that are indirectly owned by Morgan Stanley, a publicly traded company.

Allianz SE has no parent corporation, and, based on publicly available SEC filings, no publicly held corporation owns greater than 10% of its common stock.

Morgan Stanley has no parent corporation.  Based on Securities and Exchange Commission Rules regarding beneficial ownership, the following entity owns greater than 10% of its common stock: Mitsubishi UFJ Financial Group, Inc.

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1166

Short Caption: Uetricht, et al. v. Chicago Parking Meters, LLC

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Chicago Parking Meters, LLC

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Winston & Strawn LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

See attached Exhibit A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

See attached Exhibit A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

Not applicable

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Not applicable

Attorney's Signature: /s/ Robert Y. Sperling    Date: 05/11/2022

Attorney's Printed Name:  Robert Y. Sperling

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]  No [✓]

Address:  35 W. Wacker Drive

Chicago, IL 60601

Phone Number: (312) 558-5600    Fax Number: (312) 558-5700

E-Mail Address: RSperling@winston.com

rev. 12/19 AK

**EXHIBIT A**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the following disclosures are made on behalf of Chicago Parking Meters, LLC ("CPM") by counsel:

CPM is a limited liability company whose members include a corporation that is indirectly owned in part by Allianz SE, a publicly traded company, and limited partnerships that are indirectly owned by Morgan Stanley, a publicly traded company.

Allianz SE has no parent corporation, and, based on publicly available SEC filings, no publicly held corporation owns greater than 10% of its common stock.

Morgan Stanley has no parent corporation. Based on Securities and Exchange Commission Rules regarding beneficial ownership, the following entity owns greater than 10% of its common stock: Mitsubishi UFJ Financial Group, Inc.

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1166

Short Caption: Uetricht, et al. v. Chicago Parking Meters, LLC

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Chicago Parking Meters, LLC

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Winston & Strawn LLP

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

       See attached Exhibit A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       See attached Exhibit A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

Not applicable

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Not applicable

Attorney's Signature: /s/ Joseph L. Motto       Date: 05/11/2022

Attorney's Printed Name: Joseph L. Motto

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑   No ☐

Address: 35 W. Wacker Drive

       Chicago, IL 60601

Phone Number: (312) 558-5600       Fax Number: (312) 558-5700

E-Mail Address: JMotto@winston.com

rev. 12/19 AK

**EXHIBIT A**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the following disclosures are made on behalf of Chicago Parking Meters, LLC ("CPM") by counsel:

CPM is a limited liability company whose members include a corporation that is indirectly owned in part by Allianz SE, a publicly traded company, and limited partnerships that are indirectly owned by Morgan Stanley, a publicly traded company.

Allianz SE has no parent corporation, and, based on publicly available SEC filings, no publicly held corporation owns greater than 10% of its common stock.

Morgan Stanley has no parent corporation. Based on Securities and Exchange Commission Rules regarding beneficial ownership, the following entity owns greater than 10% of its common stock: Mitsubishi UFJ Financial Group, Inc.

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1166

Short Caption: Uetricht, et al. v. Chicago Parking Meters, LLC

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Chicago Parking Meters, LLC

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Winston & Strawn LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        See attached Exhibit A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        See attached Exhibit A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

Not applicable

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Not applicable

Attorney's Signature: /s/ Conor Reidy    Date: 05/11/2022

Attorney's Printed Name: Conor Reidy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes [ ] No [✓]

Address: 35 W. Wacker Drive

Chicago, IL 60601

Phone Number: (312) 558-5600    Fax Number: (312) 558-5700

E-Mail Address: CReidy@winston.com

**EXHIBIT A**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the following disclosures are made on behalf of Chicago Parking Meters, LLC ("CPM") by counsel:

CPM is a limited liability company whose members include a corporation that is indirectly owned in part by Allianz SE, a publicly traded company, and limited partnerships that are indirectly owned by Morgan Stanley, a publicly traded company.

Allianz SE has no parent corporation, and, based on publicly available SEC filings, no publicly held corporation owns greater than 10% of its common stock.

Morgan Stanley has no parent corporation. Based on Securities and Exchange Commission Rules regarding beneficial ownership, the following entity owns greater than 10% of its common stock: Mitsubishi UFJ Financial Group, Inc.

## TABLE OF CONTENTS

Page(s)

INTRODUCTION......................................................................................1

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES ..............................................................2

STATEMENT OF THE CASE ..................................................................2

    A.    The City of Chicago/CPM Concession Agreement .........................2

    B.    Relevant Illinois Statutory Authority Authorizing the Concession .............4

    C.    Plaintiffs' Operative First Amended Complaint .............................6

    D.    The District Court's Dismissal .................................................8

STANDARD OF REVIEW .......................................................................10

SUMMARY OF THE ARGUMENT ........................................................10

ARGUMENT.............................................................................................14

I.    The district court correctly held that Plaintiffs' claims are barred by state-action antitrust immunity. ............................................................14

    A.    The Concession is a foreseeable exercise by the City of powers granted by Illinois state law. ..................................................14

    B.    Plaintiffs' new argument that 65 ILCS 5/11-71-1 applies only to off-street parking meters is both waived and incorrect.......................18

    C.    Plaintiffs' argument based on active supervision does not provide this Court with a reason to reverse................................................22

        1.    As a matter of well-established law, an active supervision requirement does not apply in this context. .......................22

        2.    Even if active supervision is required, the Concession meets that standard................................................................28

II.    The extraordinary untimeliness of Plaintiffs' suit provides an alternative ground for affirmance. ...............................................................30

CONCLUSION.........................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*,
    263 F.3d 239 (3d Cir. 2001) ................................................................23

*Active Waste Disposal, Inc. v. City of Darien*,
    635 F.3d 883 (7th Cir. 2011) ..............................................................16

*Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*,
    129 F. Supp. 3d 614 (N.D. Ill. 2015) ............................................31, 32

*Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*,
    326 F. Supp. 3d 602 (N.D. Ill. 2018) ............................................16, 28

*Alioto v. Town of Lisbon*,
    651 F.3d 715 (7th Cir. 2011) ..............................................................18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................10

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*,
    155 F.3d 59 (2d Cir. 1998) ...........................................................11, 24

*Bertha v. Hain*,
    787 F. App'x 334 (7th Cir. 2019) .......................................................18

*Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.*,
    331 U.S. 519 (1947) ............................................................................19

*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*,
    445 U.S. 97 (1980) ........................................................................10, 11

*Campbell v. Chicago*,
    823 F.2d 1182 (7th Cir. 1987) ......................................................14, 16

*Cannon v. Univ. Health Scis./Chi. Med. Sch.*,
    710 F.2d 351 (7th Cir. 1983) ........................................................30, 31

*Chamber of Com. of the U.S. of Am. v. City of Seattle*,
    890 F.3d 769 (9th Cir. 2018) ........................................................25, 27

*Charles Fiore Nurseries, Inc. v. Vill. of Long Grove*,
    1986 WL 10372 (N.D. Ill. Sept. 16, 1986)............................................................15

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*,
    810 F.2d 869 (9th Cir. 1987)............................................................23

*Chattanooga Mfg., Inc. v. Nike, Inc.*,
    301 F.3d 789 (7th Cir. 2002)............................................................32

*Checker Taxi Co. v. Nat'l Prod. Workers Union*,
    113 F.R.D. 561 (N.D. Ill. 1987)............................................................31

*Cine 42nd St. Theater Corp. v. Nederlander Org., Inc.*,
    790 F.2d 1032 (2d Cir. 1986) ............................................................11, 13, 24

*City of Bloomington v. Wirrick*,
    381 Ill. 347 (Ill. 1942)............................................................21

*Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*,
    850 F.3d 567 (3d Cir. 2017)............................................................26

*Eichman v. Fotomat Corp.*,
    880 F.2d 149 (9th Cir. 1989)............................................................32

*FTC v. Phoebe Putney Health Sys.*,
    568 U.S. 216 (2013)............................................................17, 28

*FTC v. Ticor Title Ins. Co.*,
    504 U.S. 621 (1992)............................................................22

*Gov't of P.R. v. Carpenter Co.*,
    442 F. Supp. 3d 464 (D.P.R. 2020)............................................................30

*Grand Rapids Plastics, Inc. v. Lakian*,
    188 F.3d 401 (6th Cir. 1999)............................................................32

*Green Sols. Recycling, LLC v. Reno Disposal Co.*,
    814 F. App'x 218 (9th Cir. 2020) ............................................................11, 24, 27, 28

*Hannemann v. S. Door Cnty. Sch. Dist.*,
    673 F.3d 746 (7th Cir. 2012)............................................................18

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
    191 F.3d 813 (7th Cir. 1999)............................................................30

*Indep. Voters of Ill. Indep. Precinct Org. v. Ahmad,*
   2014 IL App (1st) 123629, 13 N.E.3d 251 ........................................3, 7

*Jauquet v. Green Bay Area Catholic Edu., Inc.,*
   996 F.3d 802 (7th Cir. 2021) ..................................................................10

*Justice v. Town of Cicero,*
   577 F.3d 768 (7th Cir. 2008) ..................................................................15

*L & H Sanitation, Inc. v. Lake City Sanitation, Inc.,*
   769 F.2d 517 (8th Cir. 1985) ............................................................12, 25

*LaFaro v. N.Y. Cardiothoracic Grp., PLLC,*
   570 F.3d 471 (2d Cir. 2009) ....................................................................23

*LaSalle Nat'l Bank v. County of DuPage,*
   777 F.2d 377 (7th Cir. 1985) ............................................................14, 16

*Lathrop v. Juneau & Assocs.,*
   220 F.R.D. 330 (S.D. Ill. 2004) .........................................................15, 17

*Maher v. City of Chi.,*
   547 F.3d 817 (7th Cir. 2008) ..................................................................31

*Metavante Corp. v. Emigrant Sav. Bank,*
   619 F.3d 748 (7th Cir. 2010) ..................................................................18

*Mich. Paytel Joint Venture v. City of Detroit,*
   287 F.3d 527 (6th Cir. 2002) ............................................................11, 24

*Midwestern Mach. Co. v. Nw. Airlines, Inc.,*
   392 F.3d 265 (8th Cir. 2004) ..................................................................30

*Milwaukee Police Ass'n v. Flynn,*
   863 F.3d 636 (7th Cir. 2017) ............................................................2, 4, 7

*Morgan v. Div. of Liquor Control,*
   664 F.2d 353 (2d Cir. 1981) ....................................................................28

*N.C. State Bd. of Dental Exam'rs v. FTC,*
   574 U.S. 494 (2015)............................................................................25, 27

*Oliver v. SD-3D LLC,*
   751 F.3d 1081 (9th Cir. 2014) ................................................................30

*Parker v. Brown,*
    317 U.S. 341 (1943)................................................................................10, 23, 28

*Patrick v. Burget,*
    486 U.S. 94 (1988)................................................................................13, 28

*Puffer v. Allstate Ins. Co.,*
    675 F.3d 709 (7th Cir. 2012) ...................................................................18

*Reveal Chat Holdco, LLC v. Facebook, Inc.,*
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ....................................................31

*S. Austin Coal. Cmty. Council v. SBC Commc'ns, Inc.,*
    274 F.3d 1168 (7th Cir. 2001) .................................................................25

*S. Motor Carriers Rate Conf. v. United States,*
    471 U.S. 48 (1985)...................................................................................23

*Smith v. Caterpillar, Inc.,*
    338 F.3d 730 (7th Cir. 2003) ...................................................................31

*Storie v. Randy's Auto Sales, LLC,*
    589 F.3d 873 (7th Cir. 2009) ...................................................................19

*Tec Cogeneration v. Fla. Power & Light Co.,*
    76 F.3d 1560 (11th Cir. 1996) .................................................................28

*Thompson v. Ill. Dept. of Prof'l Regulation,*
    300 F.3d 750 (7th Cir. 2002) ...................................................................10

*Tom Hudson & Assocs., Inc. v. Chula Vista,*
    746 F.2d 1370 (9th Cir. 1984) .................................................................28

*Town of Hallie v. City of Eau Claire,*
    471 U.S. 34 (1985)............................................................................ *passim*

*United States v. Heon Seok Lee,*
    937 F.3d 797 (7th Cir. 2019) ...................................................................19

*Varner v. Peterson Farms,*
    371 F.3d 1011 (8th Cir. 2004) .................................................................32

*Warciak v. Subway Rests., Inc.,*
    949 F.3d 354 (7th Cir. 2020) ...................................................................10

*Witzke v. Female*,
  376 F.3d 744 (7th Cir. 2004) .........................................................................20

*Zelazny v. Lyng*,
  853 F.2d 540 (7th Cir. 1988) .........................................................................31

*Zimomra v. Alamo Rent-A-Car*,
  111 F.3d 1495 (10th Cir. 1997) .....................................................................26

**Statutes**

65 ILCS 5/1-1-10 (2021) ...............................................................5, 14, 15, 17

65 ILCS 5/11-71-1 (1961) ..................................................................... *passim*

65 ILCS 5/11-71-1 (2007) .............................................................5, 15, 18, 19

65 ILCS 5/11-135.5-25 (2021) .......................................................................17

65 ILCS 5/11-135-6 (2007) ............................................................................17

Ill. Rev. Stat., ch. 24, art. 52.1 (1947)...................................................4, 20, 21

**Other Authorities**

Chi. City Council, Journal of Council Proceedings, Dec. 4, 2008
  https://chicityclerk.s3.amazonaws.com/s3fs-
  public/document_uploads/journals-proceedings/2008/120408SP.pdf......................2

Chi. City Council, Journal of Council Proceedings, June 5, 2013
  https://chicityclerk.s3.amazonaws.com/s3fs-
  public/document_uploads/journals-proceedings/2008/120408SP.pdf......................2

Chi. Dep't. of Transp., *2017 Bikeways – Year in Review* (2018)
  https://secureservercdn.net/198.71.233.36/40f.4ba.myftpupload.com/
  wp-content/uploads/2013/06/YearEndReview_2017_2018_0416.pdf........................7

## INTRODUCTION

The district court correctly dismissed this case based on antitrust state-action immunity.  Plaintiffs have asserted federal antitrust claims against a government contracting party, alleging that its contract with the City of Chicago violates the Sherman Act.  But as the Supreme Court has held for decades, municipalities are immune from federal antitrust challenges when they are carrying out their authority under state law with foreseeable results.  That same immunity extends to their contracting parties.  The district court's ruling in this case faithfully follows decisions of the Supreme Court—and of every circuit to address the issue—holding that a private party may claim this immunity for a government contract without needing to show that its performance of the contract is actively supervised by the state.  Plaintiffs' arguments to the contrary are either waived, wrong as a matter of federal law, contradicted by the relevant state statutes, or belied by the terms of the contract (which the complaint incorporates).  Alternatively, Plaintiffs' claims are untimely, brought more than twelve years after any purported anticompetitive action.  This Court may affirm the dismissal on any of these independent grounds, among others.

## JURISDICTIONAL STATEMENT

Plaintiffs' jurisdictional statement is complete and correct.  The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Did the district court correctly hold that the state-action immunity doctrine bars Plaintiffs' Sherman Act claims challenging the City of Chicago's Concession Agreement with Defendant Chicago Parking Meters, LLC to operate the City's on-street metered parking system, consistent with binding Supreme Court precedent and the plain terms of Illinois law?

2.      Are Plaintiffs' Sherman Act claims, which they filed 12.5 years after the Concession Agreement was publicly bid and executed, untimely based on the doctrine of laches?

## STATEMENT OF THE CASE

### A.      The City of Chicago/CPM Concession Agreement

In 2008, the City of Chicago ("City") solicited public bids for a contract to operate the on-street metered parking system on behalf of the City.  A217.[1]  Defendant Chicago Parking Meters, LLC ("CPM") made the highest bid, $1.15 billion, and was awarded the contract by way of public ordinance.  A217.  The City and CPM executed the Chicago Metered Parking System Concession Agreement ("Concession") in December 2008.

---

[1] Record cites refer to the Appendix of Plaintiffs-Appellants ("A"); the Supplemental Appendix of Defendant-Appellee Chicago Parking Meters, LLC, submitted herewith ("SA"), which contains historical versions of certain Illinois State statutes; and specifically as to the parties' motion to dismiss briefing before the district court, district court docket entries, by docket entry number and ECF-generated page number ("ECF # at #").  For ease of reference, Plaintiffs' operative First Amended Complaint is cited at A11-25, and the Concession is cited at A26-235.  The Court can and should take judicial notice of the Concession because Plaintiffs incorporated it by reference through and attached it to their complaint.  A11.  *See Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017) ("[T]he court may take into consideration documents incorporated by reference to the pleadings.") (internal marks and citation omitted).

A217–18.[2]  Under the Concession, CPM has operated the metered parking system for the City since then, always and fully "subject to the reserved police powers and regulatory powers of the City."  A35, A59, A65–66.[3]  The City's reserved powers include the power to add or remove parking meters from operation (A59, A93–96), to set meter hours of operation and periods of stay, and also to set meter fees (A59, A92–93), subject to an initial agreed fee increase that the City put into effect from 2008 to 2013 (A225–27).  *See also Indep. Voters of Ill. Indep. Precinct Org. v. Ahmad*, 2014 IL App (1st) 123629 ¶ 72, 13 N.E.3d 251 (rejecting a prior challenge to the Concession and finding that "the concession agreement here reserves to the City a wide discretion in the matter of the location, regulation and control of the metered parking spaces").

To preserve the benefit of the bargain between CPM and the City based on CPM's $1.15 billion payment, the Concession has mechanisms by which the City compensates CPM—or, on the other hand, CPM credits the City—for City actions that increase or decrease the value of the system.[4]  CPM has, in turn, incurred significant expense to maintain and improve the system since 2008.  A84–89 (setting forth CPM's

---

[2] *See* Chi. City Council, Journal of Council Proceedings, Dec. 4, 2008, at 50508–09, *available at* https://chicityclerk.s3.amazonaws.com/s3fs-public/document_uploads/journals-proceedings/2008/120408SP.pdf.

[3] The Concession has been amended from time to time and was restated in 2013, though not in any way that Plaintiffs claim is relevant to their case.  *See* Chi. City Council, Journal of Council Proceedings, June 5, 2013, at 54082–83, *available at* https://chicityclerk.s3.amazonaws.com/s3fs-public/document_uploads/journals-proceedings/2008/120408SP.pdf.

[4] *See, e.g.*, A92–110 (provisions setting forth mechanisms for payments relating to meter closures and certain other fluctuations in system usage), A141–43 (provisions describing potential compensation mechanism relating to the City's exercise of Reserved Powers in a manner adversely affecting Concession market value), A145–46 (provisions describing potential payment for "Compensation Events," generally meaning certain specified events or expenses/losses associated with CPM's compliance with directives from the City).

obligations to improve and maintain the metered parking system); *see also Ahmad*, 2014 IL App (1st) 123629 ¶ 6 (describing how CPM "upgrad[ed] the parking meter system by installing [4,600] 'Pay and Display' pay boxes that permit payment by credit or debit card, allow more cars to park on the street, and allow customers to purchase 'portable time' (i.e., the right to park in multiple meter locations without paying duplicative meter fees).").

B.     **Relevant Illinois Statutory Authority Authorizing the Concession**

The State of Illinois has long authorized municipalities to contract with private parties for the management and operation of parking meters via agreements like the Concession. In 1947, the Illinois General Assembly amended Article 52.1 of the Revised Cities and Villages Act, entitled "Special Powers—Parking Space for Motor Vehicles." Ill. Rev. Stat., ch. 24, art. 52.1 (1947), SA1–5. This law authorized Illinois municipalities to "own, construct, equip, manage, control, erect, maintain and operate motor vehicle parking lot or lots, garage or garages, parking meters, and any other revenue producing facilities necessary or incidental to the regulation, control and parking of motor vehicles (hereinafter referred to as parking facilities)." *Id.* § 52.1-1(a) (1947), SA3. To implement these parking-meter-related powers, municipalities were further authorized to "enter into contracts dealing in any manner with the objects and purposes of this Article." *Id.* § 52.1-1(c) (1947), SA3. This statutory authorization was amended from time to time but remained substantively intact through 2008, when the Concession was executed, and up to the present day.

In 1961, the authorization was codified into Illinois's Compiled Statutes at

65 ILCS 5/11-71-1, *et seq.* (1961). *See* SA6–11. Though the title of the statute changed

from "Parking Facilities for motor vehicles" to "Off-Street Parking," the legislature

preserved the broad authorization for municipalities to construct and operate parking

facilities, and to "enter into contracts dealing in any manner with" motor vehicle

parking; it did not add any limitations to a municipality's authority to own and operate

parking meters and enter into contracts relating to the same. 65 ILCS 5/11-71-1 (1961),

SA7–8. In its modern form, the authorization expanded to expressly include certain off-

street parking facilities in the text, instead of merely the title—otherwise it remains the

same and broadly authorizes municipalities to make use of parking meters. 65 ILCS

5/11-71-1(a) (2007) (authorizing municipalities to "own, construct, equip, manage,

control, erect, improve, extend, maintain and operate motor vehicle parking lot or lots,

garage or garages constructed on, above and/or below ground level, public off-street

parking facilities for motor vehicles, *parking meters*, and any other revenue producing

facilities, hereafter referred to as parking facilities, necessary or incidental to the

regulation, control and parking of motor vehicles" (emphasis added)). And, at each

step, the statute has retained municipalities' authority to "enter into contracts dealing in

any manner with the objects and purposes of this Division 71." *Id.* § 11-71-1(c) (2007);

*see also* SA8 (same).

Additionally, the Illinois General Assembly sought to ensure that municipalities

are not encumbered by antitrust laws in exercising their state-delegated powers. In

1961, the State of Illinois' "Policy Concerning Exercise of Powers by Local

5

Governments" became law.  65 ILCS 5/1-1-10 (1961).  The law remains in effect today

and provides "that all powers granted, either expressly or by necessary implication . . .

to municipalities may be exercised . . . notwithstanding effects on competition." *Id.*  It

expresses Illinois State policy that "[i]t is the intention of the General Assembly that the

'State action exemption' to the application of federal antitrust statutes be fully available

to all municipalities . . . to the extent they are exercising authority as aforesaid,

including, but not limited to, . . . all of Divisions of Articles 10 and 11 of the Illinois

Municipal Code," *id.* § 1-1-10(b) (1961), which includes 65 ILCS 5/11-71-1, the law

concerning motor vehicle parking meters.

### C.    Plaintiffs' Operative First Amended Complaint

More than twelve years after it began, Plaintiffs filed this lawsuit challenging the

Concession.  Plaintiffs do not complain that CPM violated the Concession, but rather

that the Concession itself, which CPM has at all times abided by, is an illegal restraint of

trade.  Plaintiffs claim to be "car owners who live in various Chicago neighborhoods . . .

who from time to time . . . pay . . . for parking at the Metered Parking System."  A12–13.

Plaintiffs asserted claims under (1) Section 2 of the Sherman Act, (2) Section 1 of the

Sherman Act, and (3) Illinois's Consumer Fraud and Deceptive Practices Act.  ECF 1.

CPM moved to dismiss.  ECF 18.  Rather than respond to CPM's motion, Plaintiffs filed

the operative First Amended Complaint.  A11–25.

The gist of the First Amended Complaint is that, despite the plethora of parking

garages, paid parking lots, free business-supplied parking, and free parking spaces in

Chicago, the Concession gives CPM a supposed "illegal monopoly" over the parking

meter system in Chicago for the 75-year Concession term, which allegedly prevents the City from instituting alternative forms of transportation, such as bike lanes, express bus lanes, and pedestrian ways. A11–13, A16, A22–24. Notwithstanding the text of the Concession vesting the City with control over meter rates, Plaintiffs claim the Concession "locks in" prices (A12) and allows CPM to set meter rates (A14), which the City is then supposedly "require[d] . . . to impose . . . during the entire 75-year term of the Agreement" (A15).

Plaintiffs also repeatedly claim that the Concession "prohibits" regulation (A16) or imposes a "ban on active regulation" of the public ways by the City and grants CPM "exclusive access to the public streets and curb space." A12–14, A16–18. But the Concession says otherwise, expressly reserving for the City total authority to police and regulate transportation in Chicago, including metered parking. A35, A59, A65–66. And, "[t]he City has, in fact, exercised its police powers to make changes to the metered-parking system, for the benefit of the public, notwithstanding the concession agreement's compensation provisions." *Ahmad*, 2014 IL App (1st) 123629 ¶ 81. Plaintiffs admit this. A17 (alleging that the City compensated CPM under the Concession relating to the City's use of its reserved powers).[5]

---

[5] It is also a well-publicized fact, proper for judicial notice, that the City expanded bike lanes in recent years, while the Concession has been in effect. *See, e.g.*, Chi. Dep't. of Transp., *2017 Bikeways – Year in Review* (2018), available at https://secureservercdn.net/198.71.233.36/40f.4ba.myftpupload.com/wp-content/uploads/2013/06/YearEndReview_2017_2018_0416.pdf. *See Milwaukee Police Ass'n*, 863 F.3d at 640.

Plaintiffs request an order to "[e]njoin CPM from enforcing the [Concession] unless and until CPM has modified the [Concession] to permit active regulation by the City of the Metered Parking System and a reasonable termination date for such [Concession], as modified."  A23–24.  In other words, Plaintiffs essentially seek an order invalidating the Concession, absent modification in an unspecified way to purportedly foster more "active regulation" and a rebidding of the right to operate the system, for which CPM paid more than $1 billion.

### D.     The District Court's Dismissal

CPM moved to dismiss the First Amended Complaint, arguing that Plaintiffs lack Article III and antitrust standing, their antitrust claims are barred by the state-action immunity doctrine, they failed to plausibly allege the elements of their claims, and their 12.5-year delay in suing renders the claims untimely under the doctrine of laches.  ECF 18.

The district court granted CPM's motion, holding that the state-action immunity doctrine forecloses Plaintiffs' Sherman Act claims.  A10.  It concluded that the Concession was authorized by, and was a foreseeable result of, Illinois state policies. A8.  The court rejected Plaintiffs' argument that the Illinois Municipal Code "presumes that the City will at all times own and operate the parking meters on public streets," (A9) explaining that nothing in the Code "compel[s] the City to own and operate the parking meters"; instead "it merely authorizes the City to do so if it so chooses."  *Id.* The court found that the authorization of 65 ILCS 5/11-71-1(c) for municipalities to enter contracts "*dealing in any manner*" with parking meters necessarily includes the

power to enter contracts, such as the Concession.  A8–9 (citing 65 ILCS 5/11-71-1(c) (2007)).  On appeal, Plaintiffs have not raised their argument that the City must own and operate the parking meters, but rather have pivoted to a new, conflicting, and erroneous argument—that 65 ILCS 5/11-71-1 applies only to off-street parking.

The district court also rejected Plaintiffs' argument that 65 ILCS 5/11-71-1(c)'s authorization to "enter into contracts dealing in any manner" is limited to contracts "for advertising purposes."  A9.  It reasoned that Plaintiffs' interpretation would unduly "restrict the scope of the subjects the legislature intended to include in the act," contrary to well-established principles of statutory interpretation.  *Id.*  Additionally, based on the plain language of the statute, the court determined that Plaintiffs' interpretation "would improperly read" the phrase "dealing in any manner with" "out of the Municipal Code," violating the rule against surplusage.  A9–10.  Plaintiffs have not raised this argument on appeal, either.

Lastly, the district court considered and rejected Plaintiffs' argument that the Concession must be "subject to active supervision by the City" for the state-action immunity doctrine to apply.  A10.  The court recognized that the Supreme Court "made clear" in *Town of Hallie* "that 'the active state supervision requirement should not be imposed in cases in which the actor is a municipality,'" such as Plaintiffs' challenge to the Concession.  *Id.* (quoting *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 42 (1985)).

Except to find standing, the district court did not address CPM's remaining arguments in support of dismissal, including the argument based on laches.  Having dismissed Plaintiffs' Sherman Act claims with prejudice under the state-action

immunity doctrine, the Court declined to exercise supplemental jurisdiction over

Plaintiffs' state-law claim.  A10.

## STANDARD OF REVIEW

"A dismissal for failure to state a claim is reviewed under a *de novo* standard."

*Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 356 (7th Cir. 2020).  To survive a motion to

dismiss, a complaint must allege "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While courts typically accept "all the

facts pled as true and constru[e] all inferences in favor of the plaintiff," it is a "well-

settled rule that when a written instrument contradicts allegations in a complaint to

which it is attached, *the exhibit trumps the allegations*."  *Thompson v. Ill. Dept. of Prof'l*

*Regulation*, 300 F.3d 750, 753–54 (7th Cir. 2002).  Finally, on appeal from a dismissal with

prejudice, "[t]he Court may affirm on any ground supported by the record."  *Jauquet v.*

*Green Bay Area Catholic Edu., Inc.*, 996 F.3d 802, 807 (7th Cir. 2021) (citations omitted).

## SUMMARY OF THE ARGUMENT

The district court correctly held that the City's Concession with CPM is immune

from antitrust liability under the state-action immunity doctrine.  The concept of state-

action immunity was first established in *Parker v. Brown*, 317 U.S. 341 (1943), where the

Supreme Court held that the Sherman Act does not apply to the anticompetitive

conduct of a state acting through its legislature.  In *Midcal*, the Supreme Court

established a two-part test to determine whether alleged anticompetitive conduct on the

part of a private party is immunized under the state-action immunity doctrine.  *Cal.*

*Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980).  First, "the challenged restraint must be one clearly articulated and affirmatively expressed as state policy."  *Id.* (internal quotation marks omitted).  Second, "the policy must be actively supervised by the State itself."  *Id.*

In *Town of Hallie*, the Supreme Court extended the state-action immunity doctrine to municipalities, holding that they are immune from federal antitrust challenges when acting pursuant to the "clearly articulated and affirmatively expressed" state policy requirement of *Midcal*.  471 U.S. at 44 (1985).  *Town of Hallie* clarified that it is sufficient to satisfy that requirement if anticompetitive effects are a "foreseeable result" of the state's grant of authority to the municipality.  *Id.* at 42.  As for the second *Midcal* requirement, active supervision by the State, the Court held "that the active state supervision requirement should not be imposed in cases in which the actor is a municipality," reasoning that "[o]nce it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function."  *Id.* at 46-47.

Since *Town of Hallie*, courts have repeatedly held that, by its rationale, in the context of contracts between state political subdivisions and private parties, if the contracting government entity is immune from challenge because the contract was a foreseeable exercise of state policy, so, too, is a private party sued based on its participation in that contract.  And none of these courts have required a demonstration of active state supervision.  *See, e.g.*, *Green Sols. Recycling, LLC v. Reno Disposal Co.*, 814 F. App'x 218, 221-22 (9th Cir. 2020); *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d

11

527, 538–39 (6th Cir. 2002); *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 74 (2d Cir. 1998); *Cine 42nd St. Theater Corp. v. Nederlander Org., Inc.*, 790 F.2d 1032, 1043 (2d Cir. 1986); *L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517, 521–22 (8th Cir. 1985).

Following this line of authority, this Court should affirm the district court's dismissal. The Concession is protected under the state-action immunity doctrine because the City's execution of the Concession was a foreseeable exercise of its authority under Illinois state law, 65 ILCS 5/11-71-1, to contract in relation to its on-street parking meters. *Town of Hallie*, 471 U.S. at 42. Plaintiffs' argument that the relevant Illinois Municipal Code sections only apply to *off-street* metered parking, not on-street metered parking, was waived, as Plaintiffs did not make that argument before the district court. They made an irreconcilable argument — that the statute contemplates that the City will at all times own the on-street metered parking system. ECF 28, at 18. Regardless, Plaintiffs' new argument is without merit. The plain language of section 5/11-71-1 includes all metered parking and is not limited to off-street meters, and Plaintiffs' interpretation conflicts with established principles of statutory construction.

The district court correctly rejected Plaintiffs' argument that CPM could not claim immunity without showing that the State of Illinois actively supervises the Concession. *Town of Hallie* held that there is no such requirement in cases challenging the actions of a municipality. 471 U.S. at 46. This case is such a challenge, alleging that the Concession, a municipal contract, violates the Sherman Act. As noted above, at least

the Second, Sixth, Eighth, and Ninth Circuits have held that active supervision is not required for immunity to apply to suits against private parties relating to protected government contracts, and we looked for and could not find a single Court of Appeals holding differently. To hold otherwise—that a private party may be sued under the Sherman Act in relation to a city contract, based on lack of active state supervision, even though the city itself could not be sued on that basis—would undermine *Town of Hallie* and subject protected government contracts to "tangential attacks" via targeted suits against only the private counterparties to those contracts. *Cine 42nd St. Theater Corp.*, 790 F.2d at 1048. Such a tangential attack is particularly unwarranted here, where the electorally accountable City of Chicago, not CPM, retains regulatory authority and discretion to control the parking meter system that is the subject of the contract.

In any event, even if the active supervision requirement applies to these circumstances—and it does not—it is satisfied. Active supervision is met if the municipality "exercise[s] ultimate control over the challenged anticompetitive conduct," *Patrick v. Burget*, 486 U.S. 94, 101 (1988), which is true of the Concession. The City, not CPM, controls the supply and pricing of metered parking spaces. CPM has no discretion to add or remove meters or to set their terms of operation. The active supervision requirement is satisfied in such circumstances, given that the public body, not the private party, ultimately controls the allegedly anticompetitive restraints.

Merit aside, this Court may also affirm on an alternative ground not reached by the district court: Plaintiffs' claims are untimely based on laches. The Concession was entered into in December 2008, yet Plaintiffs waited until June 2021 to file this lawsuit,

13

long after CPM expended $ 1.15 billion to acquire the Concession rights and made

investments in the metered parking system over the last 12.5 years.  That 12.5-year,

unwarranted, and prejudicial delay independently justifies dismissal as a matter of law.

This Court may affirm the judgment on that basis as well.

## ARGUMENT

**I.**   **The district court correctly held that Plaintiffs' claims are barred by state-action antitrust immunity.**

Allegedly anticompetitive arrangements between municipalities and private

parties are shielded from federal antitrust liability if the challenged conduct is a

"foreseeable result" of the state's grant of authority to the municipality.  *Town of Hallie*,

471 U.S. at 42.[6]  The Concession easily satisfies this requirement.  Plaintiffs' arguments

to the contrary—to the extent they are not waived— are entirely without merit.

**A.**   **The Concession is a foreseeable exercise by the City of powers granted by Illinois state law.**

In its "Policy Concerning Exercise of Powers by Local Governments," 65 ILCS

5/1-1-10, the State of Illinois explicitly provided that the "[s]tate action exemption to the

application of [the] federal antitrust statute [should] be fully available to all

---

[6] *See also Campbell v. Chicago*, 823 F.2d 1182, 1184 (7th Cir. 1987) (holding that the City of Chicago was exempt from federal antitrust liability for capping the number of available taxicab licenses because the City's conduct was a foreseeable and logical result of an Illinois statute's authorization to "license, tax, and regulate hackmen, dragmen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and [to] prescribe their compensation"); *LaSalle Nat'l Bank v. County of DuPage*, 777 F.2d 377 (7th Cir. 1985) (holding that municipalities were shielded from federal antitrust liability because the allegedly anticompetitive conduct was foreseeable based on an Illinois state statute that authorized municipalities to "furnish sewerage service to municipal corporations and enter into and perform contracts with any municipality for the furnishing of sewerage service" and a statute that authorized the Illinois Environmental Protection Agency to plan with municipalities how to reduce water pollution).

municipalities." *Campbell v. Chicago*, 823 F.2d 1182, 1185 (7th Cir. 1987) ("[T]he Illinois General Assembly's passage of [65 ILCS 5/1-1-10] supports the proposition that the state legislature intended reasonably foreseeable anticompetitive acts from its grant of power to municipalities.").[7]  That authorization to engage in anticompetitive conduct encompasses 65 ILCS 5/11-71-1, *et seq.*, which, as described above, authorizes the City to regulate competition for on-street metered parking through contracts "dealing in any manner" with the City's parking meters.  *See* 65 ILCS 5/11-71-1(a) (2007); *id.* § 11-71-1(c) (2007).  Without question, therefore, it was a foreseeable result of state law that the City would execute a contract, such as the Concession, with a private party that allows the private party to "operate, maintain and improve" the City's metered parking system. *Compare* 65 ILCS 5/11-71-1(a) (2007) (authorizing municipalities to "improve, . . . maintain and operate . . . parking meters"), *with* A35 (contracting to CPM "the right to operate, maintain and improve the Metered Parking System").

This Court and district courts in this circuit routinely apply state-action immunity to reject Sherman Act claims based on similar grants of authority.  *See, e.g.*, *Justice v. Town of Cicero*, 577 F.3d 768, 775 (7th Cir. 2008) (state law authorizing local governments to "make all needful rules and regulations concerning the use of water supplied by the waterworks of the city or village" and to fix and collect water rates "as the corporate authorities may deem necessary or expedient" was sufficient to invoke

---

[7] *See also Lathrop v. Juneau & Assocs.*, 220 F.R.D. 330, 336 (S.D. Ill. 2004) ("The Illinois legislature has explicitly provided that municipalities may act in anticompetitive ways that do not comply with federal anti-trust laws.").

immunity in relation to water department requirements for water meters and fees);
*Campbell*, 823 F.2d at 1184 (city cap on available taxicab licenses was foreseeable result
of state statute authorizing city to "license, tax, and regulate" drivers and "[to] prescribe
their compensation"); *LaSalle Nat'l Bank v. County of DuPage*, 777 F.2d 377, 382–83 (7th
Cir. 1985) (county's actions in the provision of sewer services immune based on state
statute authorizing municipalities to "furnish sewerage service to municipal
corporations and may enter into and perform contracts with any municipality for the
furnishing of sewerage service"); *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 326
F. Supp. 3d 602, 620 (N.D. Ill. 2018) (municipal agency's statutory authorization to
contract in area of fire-alarm protection rendered immune its exclusive contract with
private-company defendant).

In *Active Waste Disposal*, for example, this Court recognized that the Illinois
General Assembly clearly contemplated that municipalities may enter exclusive
contracts like the Concession, leading to the creation of monopolies from which "anti-
competitive effects will necessarily follow." *Active Waste Disposal, Inc. v. City of Darien*,
635 F.3d 883, 889 (7th Cir. 2011) ("In the context of municipal powers, it is generally
understood that the authority to contract contemplates the power to create exclusive
contracts."). The Court further held that to trigger immunity for municipal contracts
under *Town of Hallie*, the legislature is not "required to articulate how competition will
be displaced," rather "[a]ll that matters is whether the anti-competitive effects would
logically result from the authority to regulate." *Id.* at 888–89.

16

Plaintiffs' brief does not engage with that case law, and it also fails to respond to the fact that the State of Illinois has explicitly "provided that municipalities may act in anticompetitive ways that do not comply with federal anti-trust laws" under 65 ILCS 5/1-1-10. *Lathrop*, 220 F.R.D. at 336. Instead, Plaintiffs rest on *FTC v. Phoebe Putney Health Sys.*, 568 U.S. 216 (2013), Br. at 17, which rejected the notion that a "*general* grant of state authority to act" in the marketplace, including the power to contract, constituted authorization for a hospital authority to make anticompetitive acquisitions of competitors. 568 U.S. at 232 (emphasis added). That is not at all analogous to the statutory authorizations at issue, which *specifically* authorized the City to enter into a contract providing for the operation of its parking meters, 65 ILCS 5/11-71-1(c), and granted that authorization explicitly "notwithstanding effects on competition." 65 ILCS 5/1-1-10 (2021).

Plaintiffs also contend that the 75-year term of the Concession renders the Concession not "foreseeable," though there is nothing in the Illinois statutes to suggest so. Indeed, the statute at issue here limits leases of space at municipally owned parking lots to 99 years. *See* 65 ILCS 5/11-71-10 (2007). There are other examples where the Illinois General Assembly applied long-term limits to contracts. *See, e.g.*, 65 ILCS 5/11-135.5-25 (2021) (water supply contracts authorized for a period not exceeding 101 years); *id*. § 11-135-6 (2007) (certain real estate leases permitted for a period not to exceed 99 years). Yet, the General Assembly imposed no such limit on 65 ILCS 5/11-71-1. The district court correctly held that a long-term contract was "foreseeable."

17

**B.    Plaintiffs' new argument that 65 ILCS 5/11-71-1 applies only to off-street parking meters is both waived and incorrect.**

For the first time on appeal, Plaintiffs contend that 65 ILCS 5/11-71-1 "only concerns *off-street parking,* in parking lots or garages" because the title of the division of the Illinois Compiled Statutes containing the law is "Off-Street Parking."  Br. at 15. Plaintiffs waived this argument because they chose not to advance it in the district court.

"It is a well-established rule that arguments not raised to the district court are waived on appeal."  *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012). Moreover, "a party waives the ability to make a specific argument for the first time on appeal when the party failed to present that specific argument to the district court, even though the issue may have been before the district court in more general terms." *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 754 (7th Cir. 2012); *see also Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the waiver] rule where a party fails to develop arguments related to a discrete issue.").

Plaintiffs did not argue that 65 ILCS 5/11-71-1 is limited to off-street parking in their opposition to CPM's motion to dismiss.  ECF 28, at 17–19.  In fact, they made a conflicting argument—that 65 ILCS 5/11-71-1(a) "presumes that the City will at all times own and operate the parking meters on public streets."  *Id.* at 18; *see also* A9 (rejecting this argument).  Because Plaintiffs failed to present to the district court their argument that 65 ILCS 5/11-71-1(a) is limited to off-street parking, this Court should hold it waived.  While "[a] litigant may cite new authority on appeal," *Metavante Corp.*

*v. Emigrant Sav. Bank*, 619 F.3d 748, 773 n.20 (7th Cir. 2010), "[w]hen litigants change theories after losing in the district court, new arguments raised for the first time on appeal are waived." *Bertha v. Hain*, 787 F. App'x 334, 339 (7th Cir. 2019).

In any event, Plaintiffs' argument is simply wrong. "[T]he title of a statute and the heading of a section cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528–29 (1947); *see also United States v. Heon Seok Lee*, 937 F.3d 797, 812 (7th Cir. 2019) ("[A] title cannot override the statutory text itself."); *Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 877 n.3 (7th Cir. 2009) ("[A] heading cannot limit the plain meaning of the text."). Irrespective of its title, 65 ILCS 5/11-71-1 authorizes municipalities to "own, construct, equip, manage, erect, improve, extend, maintain and operate motor vehicle parking lot or lots, garage or garages constructed on, above and/or below ground level, public off-street parking facilities for motor vehicles, parking meters, and any other revenue producing facilities, hereafter referred to as parking facilities, necessary or incidental to the regulation, control and parking of motor vehicles." 65 ILCS 5/11-71-1(a) (2007). The plain text authorizes the operation of parking meters. There is no limitation to off-street parking meters, nor any exclusion of on-street parking meters. Indeed, Plaintiffs' quotation of the statute in their argument for how it should be interpreted based on its "plain language" remarkably excises the reference to "parking meters." Br. at 16.

Notably, whereas the statute applies the qualifier of "off-street" to describe *off-street* parking facilities for motor vehicles," that limitation is *not* given to "parking meters." That compels the conclusion that (a) the General Assembly could have, but

did not, similarly limit the reference to parking meters to be "off-street," and (b) the reference to "off-street" in the title of the statute was not meant to apply categorically to the different types of parking facilities mentioned in the statute; otherwise, the use of "off-street" to describe "off-street parking facilities for motor vehicles" would be redundant.  *See Witzke v. Female*, 376 F.3d 744, 753 (7th Cir. 2004) (courts "must read a statute to give effect to each word so as to avoid rendering any words meaningless, redundant, or superfluous" and avoid readings that would render terms "only surplusage").

The history of the statute further confirms the meaning conveyed by its text. When the original version of the statute first became law in 1947, it was titled "Special Powers—Parking Space for Motor Vehicles."  Ill. Rev. Stat., ch. 24, art. 52.1 (1947), SA3. It was 14 years later, in 1961, that the title of the Division—but not the text in any material way—was changed to "Off Street Parking."[8]  65 ILCS 5/11-71-1 (1961), SA7.  It cannot be that a division title created in 1961 controls what was meant at the time a statute was adopted in 1947.  Nor could it be inferred that the title change in 1961 was meant to limit the plain meaning of the phrase "parking meters," as used within the text

---

[8] Subsection (a) in 1961: "Acquire by purchase or otherwise, own, construct, equip, manage, control, erect, *improve, extend,* maintain and operate motor vehicle parking lot or lots, garage or garages, parking meters, and any other revenue producing facilities, *hereafter referred to as parking facilities,* necessary or incidental to the regulation, control and parking of motor vehicles, as the corporate authorities may from time to time find the necessity therefor exists, and for that purpose may acquire *real* property of any and every kind of description, whether real, personal or mixed, by gift, purchase or otherwise.  *Any municipality which has provided or does provide for the creation of a plan commission under Division 12 of this Article 11* shall submit to and receive the approval of the plan commission before establishing or operating any *such* parking facilities." SA7–8 (emphases added to revised language).

in 1947, given that no substantive change was made to that phrase.  And as shown above, the General Assembly specifically applied the term "off-street" when describing *other* types of parking apparatuses but did not do so for parking meters.

Subsection (c) to 65 ILCS 5/11-71-1, authorizing the City to "enter into contracts dealing in any manner" with parking meters, also supports that the term "parking meters" includes on-street meters.  That subsection additionally provides that any contract leasing space on parking meters for advertising "shall prohibit any interference with traffic control."  65 ILCS 5/11-71-1(c) (2007).  If this section applied exclusively to off-street parking, it would make no sense for the General Assembly to be concerned with interference with traffic control.

With all this, it is no surprise that Plaintiffs did not dispute below that this statute applies to on-street parking meters, arguing that the statute "presumes that the City will at all times own and operate the parking meters *on public streets*," ECF 28, at 18 (emphasis added), and only now switching to their present argument after losing in the district court.

Lastly, Plaintiffs argue that "when confronted with a challenge to a charge for *on-street* parking, the Illinois Supreme Court relied on the general grant of authority to municipalities to regulate traffic, now codified at 65 ILCS 5/11-80-20, and the right to regulate the streets, now codified at 65 ILCS 5/11-80-2."  Br. at 16.  That argument is misleading because the case Plaintiffs are apparently referring to—though they do not actually cite to or mention it in their brief—is from 1942.  *City of Bloomington v. Wirrick*, 381 Ill. 347 (Ill. 1942).  As described above, it was not until 1947 that the Illinois General

Assembly amended Article 52.1 of the Revised Cities and Villages Act to codify the current municipal authorization to operate and contract in relation to parking meters. Ill. Rev. Stat., ch. 24, art. 52.1 (1947), SA1–5. Today, authorization for the Concession need not come from a "general grant of authority," Br. at 16, because it is specifically authorized by 65 ILCS 5/11-71-1.

### C. Plaintiffs' argument based on active supervision does not provide this Court with a reason to reverse.

Because the Concession was a foreseeable exercise of an Illinois State statutory grant of authority to the City, state-action immunity precludes Plaintiffs' Sherman Act claims, and that is the end of the case. Plaintiffs are wrong that *Town of Hallie* further requires CPM to demonstrate "active state supervision" of the Concession. Br. at 10–11. And even if it did require active supervision, the City's own supervision and rights under the Concession would satisfy this requirement. This argument too provides no basis to set the district court's dismissal aside.

### 1. As a matter of well-established law, an active supervision requirement does not apply in this context.

The reason for the active supervision requirement, when it applies, is "to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 634–35 (1992). *Town of Hallie* held that this requirement does not apply to the actions of municipalities because "[o]nce it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's

execution of what is a properly delegated function." 471 U.S. at 47. This suit is an attack on the Concession, an immunized action by the City, and thus, under *Town of Hallie*, there is no requirement that CPM demonstrate active supervision.

Plaintiffs do not dispute that the active supervision requirement would not apply had they chosen to sue the City, as opposed to CPM, to contest the legality of the same Concession. This is fatal. As the Supreme Court explained in *Southern Motor Carriers Rate Conference v. United States,* 471 U.S. 48, 58–59 (1985), "[t]he success of an antitrust action should depend upon the nature of the activity challenged, rather than on the identity of the defendant."

Municipalities that "are immune from antitrust activity must be permitted to enter into contracts with private entities without suffering 'tangential attacks' on their authorized, anticompetitive practices via suits against the private parties." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 477 (2d Cir. 2009). "To hold otherwise," and impose an active supervision requirement on a private entity who is merely a counterparty to an immunized municipal contract, "would allow the *Parker* doctrine to be circumvented by artful pleading: 'A plaintiff could frustrate [the application of immunity] merely by filing suit against the [] private part[y], rather than the [municipality].'" *Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d 869, 878 (9th Cir. 1987) (quoting *S. Motor Carriers Rate Conf.,* 471 U.S. at 56–57); *see also A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 256 n.35 (3d Cir. 2001) ("[T]o give effect to *Parker* immunity, private parties to state action must also be immune. Otherwise, plaintiffs could sue only the private parties and by winning antitrust

judgments against them, could thwart state policies as if there were no state immunity. No state could enter into an agreement with private groups . . . because the potential liability of the private groups would prevent them from joining.").

It is no surprise, then, that every circuit to consider the issue has held that, in the context of a municipal or political subdivision contract with a private party, the private party does not need to establish active supervision to obtain state-action immunity. *Cine 42nd St. Theater Corp.* is an on-point example. State law in that case set forth a policy from which it was foreseeable that New York's Urban Development Corporation ("NYUDC"), a political subdivision of the State, would engage in public development projects, including leases of public property, alleged to be anticompetitive. 790 F.2d at 1044–47. The NYUDC, as a state subdivision, did not need to demonstrate active state supervision, per *Town of Hallie*. *Id.* at 1047. Having made that determination, the Second Circuit concluded that "the private appellees acting in concert with the NYUDC are also entitled to state immunity," without needing to demonstrate active state supervision. *Id.* at 1048. Numerous other Court of Appeal decisions are in accord. *See Green Sols. Recycling*, 814 F. App'x at 221 (state-action immunity prevented suit against private disposal company for an exclusive contract with the city; active supervision requirement was inapplicable because plaintiff's claim "essentially challenges nothing more than an agreement by the City"); *Mich. Paytel Joint Venture*, 287 F.3d at 538–39 (active supervision requirement did not apply to Sherman Act suit against private company relating to municipal contract); *Automated Salvage Transp.*, 155 F.3d at 73–74 (private entity entitled to state action immunity, without needing to establish active

24

supervision, protecting waste delivery settlement agreements with an immune government entity); *L & H Sanitation*, 769 F.2d at 521–22 (applying state action immunity, without need of establishing active supervision, to dismiss suit against private corporation with an exclusive waste disposal contract with a city entitled to immunity).

Plaintiffs cite a footnote in *Town of Hallie* stating, "[w]here state or municipal regulation by a private party is involved, however, active state supervision must be shown, even where a clearly articulated policy exists." *Town of Hallie*, 471 U.S. at 46 n.10. But that is not the situation here. CPM is not regulating; it is *operating* the parking meters for the City pursuant to the Concession, the terms of which were agreed to by the City and preserve the City's full regulatory authority over the metered system and all other public transportation in Chicago. The regulatory power thus continues to reside with the "electorally accountable municipality" and is not subject to the active supervision requirement. *See N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 511 (2015).

Even outside the context of municipal contracts, when private parties act pursuant to municipal regulation, it is not a given that active supervision is required. Courts look to whether "the anticompetitive restraint turns on the discretion of" the private actor—for example, whether the private party has discretion to control pricing. *Chamber of Com. of the U.S. of Am. v. City of Seattle*, 890 F.3d 769, 789 n.16 (9th Cir. 2018). That is not the case for the Concession. The main anticompetitive effect that the antitrust laws seek to avoid are reductions in output and increases in prices. *See S.*

*Austin Coal. Cmty. Council v. SBC Commc'ns, Inc.*, 274 F.3d 1168, 1170 (7th Cir. 2001)

(emphasizing that antitrust laws are designed to prevent "reduced output and higher

prices"). But under the Concession, CPM has no discretion to reduce the number of

metered parking spaces (output) or increase the parking meter fees (price).[9] Instead,

the Concession reserves for the City control over those aspects of the meter-parking

system. The active supervision requirement does not apply when, as is the case here,

the private party does not control those market levers. *See, e.g.*, *Edinboro Coll. Park*

*Apartments v. Edinboro Univ. Found.*, 850 F.3d 567, 574 (3d Cir. 2017); *Zimomra v. Alamo*

*Rent-A-Car*, 111 F.3d 1495, 1500 (10th Cir. 1997).

Plaintiffs do not offer any authority supporting their allegation that "financial

restrictions," which might impact how a government entity determines to exercise its

discretion over output or price, constitutes the transfer of that discretion to a private

party or otherwise triggers the active supervision requirement. *See* Br. at 3, 14; A16–18.

Nor does such a position make sense. There are, inevitably, factors that weigh on a

government's determination of how to exercise its control over a regulated market,

including political and financial considerations. Nothing in the caselaw suggests a

court is to somehow assess those factors for the purpose of determining whether to

require active supervision, and it would be an unworkable, entirely subjective task. For

---

[9] In fact, Plaintiffs—not CPM—seek here to *cut* metered parking output, not increase it. *See* A17 (alleging injury due to the City's "restricted" ability to "*remov[e]* meters to favor options like bike lanes, bus lanes, pedestrian use and the closing of public streets for commercial and public purposes, which allow Plaintiffs to save . . . from giving up car ownership altogether") (emphasis added).

example, would a court's determination of whether the City must actively supervise CPM change as the City's budget improves or deteriorates over time, even though the City at all times retained the same legal control over price and output, by the terms of the Concession?  Thus, even if this were not a circumstance involving a challenge to a municipal contract—which it unquestionably is—still, active supervision would not be required.

Plaintiffs' other cited cases are all similarly inapposite because they do not involve challenges to allegedly anticompetitive municipal contracts, but rather to the actions of private parties that had substantial discretion over prices or output.  Br. at 13–14 (citing *N.C. State Bd. of Dental Exam'rs*, 574 U.S. 494 and *City of Seattle*, 890 F.3d 769). *North Carolina State Board of Dental Examiners* involved a state dental examiners board that was created by state law but controlled by private actors vested with broad powers to "promulgate rules and regulations governing the practice of dentistry"; there was no municipal contract at issue.  574 U.S. at 500.  *City of Seattle*, noted above, could also hardly be more different than this case.  It involved a regulatory scheme that allowed private, for-hire drivers to collectively price-fix the fees for their services.  890 F.3d at 787–88.  In citing *City of Seattle*, Plaintiffs ignore the Ninth Circuit's more applicable and more recent decision regarding private-party antitrust immunity, *Green Sols. Recycling*, which involved an exclusive municipal private-party contract and held that "[t]he City's immunity from [plaintiff's] antitrust claim, . . . also entitles [the private party] to

*Parker* immunity" without applying the active supervision requirement. 914 F. App'x at 220–21.[10]

### 2. Even if active supervision is required, the Concession meets that standard.

Even if the active supervision requirement were applicable, however, it is satisfied on the facts of this case. Active supervision requires the City to "exercise ultimate control over the challenged anticompetitive conduct." *Patrick*, 486 U.S. at 101; *see Tec Cogeneration v. Fla. Power & Light Co.*, 76 F.3d 1560, 1569 (11th Cir. 1996) ("The active supervision requirement is designed to ensure that the state has 'ultimate control' over the private party's conduct, with the power to review and disapprove, if necessary, particular anticompetitive acts that may offend state policy."). It follows that where the private party's ability to determine price or output in the relevant market is circumscribed by the government, the requirement is met. *See Tom Hudson & Assocs., Inc. v. Chula Vista*, 746 F.2d 1370, 1374 (9th Cir. 1984) (holding that the city actively supervised defendant trash-removal company where it reviewed the reasonableness of defendant company's rates, and the rates in effect were attributable to action of the city); *Morgan v. Div. of Liquor Control*, 664 F.2d 353, 356 (2d Cir. 1981) (holding state statute regulating liquor prices by imposing a minimum mark-up left little or no discretion to private parties and therefore satisfied the supervision requirement); *Alarm Detection Sys.*, 326 F. Supp. 3d at 620 (holding the active supervision requirement was

---

[10] Plaintiffs also cite *Phoebe*'s discussion of *Town of Hallie*. Br. at 12. *Phoebe* was a challenge to competition-reducing acquisitions made by a substate governmental entity, making the active supervision requirement irrelevant. 568 U.S. at 225–26.

satisfied where the private party's "discretion [was] completely circumscribed by its contract with [the government entity]," the contract was "for a set term," and the contract had been "periodically adjusted according to [the government entity's] needs"). That is the case here.

The terms of the Concession make clear that CPM has no ability to determine price or output for parking meters. The Concession retains for the City control over those aspects of the market, including whether to add or remove meters and the terms of meter use, including price, subject only to a mechanism that the City compensate CPM for actions that reduce the value of the system, given CPM's $1.15 billion payment for its operation rights. A59, A65–66, A74–76, A92–93, A100–01. Furthermore, CPM has various reporting requirements to the City, such as a duty to report "all material accidents and incidents" involving parking meters and to produce an audited balance sheet to the City each calendar year. A111. The City has the power, as well, to conduct certain audits and inspections of CPM at its discretion. A113–14. These provisions circumscribing CPM's activities and subjecting them to government control and oversight fully satisfy the active supervision requirement, if it were to apply.

*     *     *

For all these reasons, the district court's dismissal was entirely correct, and Plaintiffs have not presented any basis to set it aside.

**II.     The extraordinary untimeliness of Plaintiffs' suit provides an alternative ground for affirmance.**

Although the district court did not address CPM's argument that Plaintiffs' Sherman Act claims should be dismissed based on laches, that is an independent reason to affirm.  From the face of the complaint, it is clear that Plaintiffs complain only of events that transpired and rights and obligations that were established in December 2008, when the Concession was executed.  A11, A14–15.  Yet Plaintiffs sat on their alleged claims until June 2021.

Laches bars untimely claims for equitable relief where the plaintiff's undue delay prejudices the party against whom relief is sought.  *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999).  "*Laches* is a question of degree"; "[i]f the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required."  *Id.* at 824.  A plaintiff pleads herself out of court "where, as here, the allegations of the complaint itself . . . plainly reveals that an action is untimely."  *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005).

Sherman Act claims for damages are subject to a four-year statute of limitations period.  15 U.S.C. § 15b (2018).  Though Plaintiffs seek equitable relief (A24), "equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy."  *Cannon v. Univ. Health Scis./Chi. Med. Sch.*, 710 F.2d 351, 358 (7th Cir. 1983).  Thus, the Sherman Act's four-year statute of limitations serves "as a baseline for determining whether a presumption of laches exists."  *Hot Wax*, 191

F.3d at 821.[11]  As Plaintiffs filed many years after the four-year statute ran, "[t]he length of the delay can give rise to a rebuttal presumption of laches" and "[t]he burden then shifts to the plaintiff to show that the delay was excusable, or that the defendants are not prejudiced."  *Canon*, 710 F.2d at 359 n.9.

Plaintiffs' delay is inexcusable.  They allege no facts to justify why they waited so long and argued none before the district court.  Plaintiffs allege that prices and output were "fixed" more than 12 years ago, in 2008, and have not changed since.  A11, A15.  Twelve-and-a-half years is well beyond what courts in this Circuit have deemed untimely.  *Maher v. City of Chi.*, 547 F.3d 817, 822 (7th Cir. 2008) (finding an 11-year delay "unreasonable" and affirming lower court's dismissal based on laches); *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 734 (7th Cir. 2003) (finding the eight-and-one-half-year delay in bringing suit was "inexcusable" and applying laches because defendant suffered "material prejudice"); *Zelazny v. Lyng*, 853 F.2d 540, 542 (7th Cir. 1988) (eight years); *Checker Taxi Co. v. Nat'l Prod. Workers Union*, 113 F.R.D. 561, 569–70 (N.D. Ill. 1987) (six years).  In *Alarm Detection Systems*, the court dismissed antitrust claims in comparable circumstances where the plaintiff challenged municipal ordinances and agreements between nine and 12 years after the fact.  *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d 614, 632–34 (N.D. Ill. 2015).  The court held that the

---

[11] Other circuits have determined that a four-year statute of limitations period applies to claims for injunctive relief.  *See, e.g.*, *Oliver v. SD-3D LLC*, 751 F.3d 1081, 1085–86 (9th Cir. 2014); *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 277 (8th Cir. 2004); *Gov't of P.R. v. Carpenter Co.*, 442 F. Supp. 3d 464, 474–75 (D.P.R. 2020); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 991–92 (N.D. Cal. 2020).

plaintiff's equitable claims were time-barred, notwithstanding continued performance under the challenged restraints (which Plaintiffs are likely to argue here) because merely performing under a contract does not constitute a new "overt act" by the defendant implicating the continuing-violation doctrine. *Id.* Other circuits have similarly held that continued performance under a contract does not constitute a new overt act.[12]

Even if a presumption of prejudice did not exist, CPM's significant expenditure of time and money—more than $1 billion, and 12.5 years of operations, maintenance, and upgrades to the system, A65-66, A84-89—during the period that Plaintiffs "sat idly by and chose not to challenge" the alleged conduct—"constitute[s] sufficient prejudice as a matter of law." *Chattanooga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 795 (7th Cir. 2002). These facts are all undisputed. Weighed against the lack of any explanation whatsoever on Plaintiffs' part for why they delayed in bringing suit, this is a textbook case for dismissal based on laches.

## CONCLUSION

For the foregoing reasons, the district court's dismissal should be affirmed.

Dated: May 11, 2022                                    Respectfully submitted,

                                                       By: /s/ Joseph L. Motto

---

[12] *See, e.g., Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004) ("Performance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period."); *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) (finding that payments made pursuant to contract "were only a manifestation of the previous agreement" and "do not constitute a new and independent act, as required to restart the statute of limitations."); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) ("[T]he passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations.").

Dan K. Webb
Robert Y. Sperling
Joseph L. Motto
Conor Reidy
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
DWebb@winston.com
RSperling@winston.com
JMotto@winston.com
CReidy@winston.com

*Attorneys for Defendant-Appellee*
*Chicago Parking Meters, LLC*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32**

1.      Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Cir. R. 32(c), as it contains 10,413 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as qualified by Circuit Rule 32(b), as it has been prepared in a 12-point, proportionally spaced typeface, Book Antiqua, by using Microsoft Word 2016.

Dated: May 11, 2022                                Respectfully submitted,

                                                           /s/ Joseph L. Motto
                                                           Joseph L. Motto

                                                           *Attorney for Defendant-Appellee*
                                                           *Chicago Parking Meters, LLC*

No. 22-1166

# In the United States Court of Appeals for the Seventh Circuit

MICAH UETRICHT AND JOHN KADERBEK,

*Plaintiffs-Appellants*,
v.
CHICAGO PARKING METERS, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois,
Case No. 1:21-cv-03364
The Honorable Matthew F. Kennelly

## SUPPLEMENTAL APPENDIX OF DEFENDANT-APPELLEE

WINSTON & STRAWN, LLP
Dan K. Webb
Robert Y. Sperling
Joseph L. Motto (*counsel of record*)
Conor Reidy
35 W. Wacker Dr.
Chicago, IL 60601
(312) 558-5600

## TABLE OF CONTENTS

Ill. Rev. Stat., Ch. 24, Art. 52.1 (1947) ................................................................... SA1

65 ILCS 5/11-71-1 (1961)........................................................................................... SA6

i

# ILLINOIS
# REVISED STATUTES
## 1947
## STATE BAR ASSOCIATION EDITION

Containing

All the Laws of the State of Illinois of a General and
Permanent Character to Date, Including Laws
Passed by the 65th General Assembly
Adjourned June 30, 1947

COMPILED AND EDITED
UNDER
SMITH-HURD CLASSIFICATION

CHICAGO, ILL.
BURDETTE SMITH COMPANY

Entered according to Act of Congress, in the year 1877, by
MYRA BRADWELL,
In the office of the Librarian of Congress, at Washington, D. C.

Entered according to Act of Congress, in the year 1879, by
MYRA BRADWELL,
In the office of the Librarian of Congress, at Washington, D. C.

Entered according to Act of Congress, in the year 1881, by
MYRA BRADWELL,
In the office of the Librarian of Congress, at Washington, D. C.

Entered according to Act of Congress, in the year 1882, by
MYRA BRADWELL,
In the office of the Librarian of Congress, at Washington, D. C.

Entered according to Act of Congress, in the year 1883, by
MYRA BRADWELL,
In the office of the Librarian of Congress, at Washington, D. C.

Entered according to Act of Congress, in the year 1885, by
MYRA BRADWELL,
In the office of the Librarian of Congress, at Washington, D. C.

Entered according to Act of Congress, in the year 1887, by
MYRA BRADWELL,
In the office of the Librarian of Congress, at Washington, D. C.

Entered according to Act of Congress, in the year 1889, by
MYRA BRADWELL,
In the office of the Librarian of Congress, at Washington, D. C.

Entered according to Act of Congress, in the year 1891, by
MYRA BRADWELL,
In the office of the Librarian of Congress, at Washington, D. C.

Copyright, 1893, by
MYRA BRADWELL.

Copyright, 1895, 1897, 1898, 1899, 1901, 1904, 1906, by
JAMES B. BRADWELL.

Copyright, 1908, 1910, 1912, Oct. 1912, 1914, 1916, 1918, 1920, 1921, by
B. BRADWELL HELMER.

Copyright, 1922, 1923, 1925, 1927, 1929, 1931, by
BURDETTE J. SMITH & COMPANY

Copyright, 1933, 1935, 1937, 1939, 1941, 1943, 1945, by
BURDETTE SMITH COMPANY

Copyright, 1947, by
BURDETTE SMITH COMPANY

within the corporate limits of the city for the current year. This tax shall be levied and collected in the same manner as the other general taxes for that city are levied and collected. When collected, the money from this tax shall be placed in a separate fund to be used only for the purpose of purchasing land for parks and ~~~~~ and around the city, and for the pu~~~~~ ~~~~ing, improving, and maintaining these parks and boulevards. This annual park and boulevard tax shall be levied in addition to taxes for general purposes authorized by section 16—1 and in addition to the taxes as limited by any provision of any special charter under which the city is now incorporated.

An amount not to exceed twenty per cent of this special fund may be expended for the purpose of providing music in city-owned parks during the months of May, June, July, August, and September in each year.

This section is subject to the provisions of the General Revenue Law of Illinois. As amended by act approved July 21, 1947. L.1947, p. —, H. B.No.906.

**52—6.** § 52—6. **Park association may expend fund.)** Where a boulevard and park association incorporated under the general law is doing the work provided for under section 52—5, the proceeds of the specified tax may be transferred to that association for the purposes specified in that section.

**52—7.** § 52—7. **Referendum on tax levy.)** No city is authorized to levy or collect the tax provided for by section 52—5 until the question of that levy has been submitted to the electors of the city at a general or special election and authorized by a majority of the votes cast at that election. The mayor shall give public notice at least once, not more than 30 nor less than 15 days in advance of the election at which the question is to be submitted, by publishing a notice thereof in one or more newspapers published in the municipality, or, if no newspaper is published therein, then in one or more newspapers with a general circulation within the municipality; except that, in municipalities with less than 500 population in which no newspaper is published, publication may be made by posting a notice in three prominent places within the municipality.

However, in any city whose electors have authorized the levy of a tax under "An Act to provide for the assessment and collection of a general tax by cities for parks and boulevard purposes," approved June 17, 1893, as amended, that tax may be continued to be levied under sections 52—5 to 52—7, inclusive, without submitting the question of its levy to the electors for approval. As amended by act approved July 21, 1947. L.1947, p. —, H.B.No.659.

### PARKS IN CITIES UNDER 15,000

**52—8.** § 52—8. **May acquire land for and improve public parks—Referendum.)** Every city with a population not exceeding 15,000 has the power to acquire by purchase, or otherwise, land in or within four miles of the corporate limits of the city for the purpose of providing public parks for the use of the city's inhabitants. It may enclose, improve, and maintain such a public park and regulate its use by ordinance. However, no money shall be expended for the purchase of any land for the designated purpose until the question whether the money shall be so expended has been submitted to a vote of the electors of the city at an election for city officers, or at a special election called for that purpose by the city council, and has received the approval of a majority of the votes cast at that election.

But any city whose electors have approved the question of the expenditure of money for the purchase of land for the designated purpose under "An Act to enable certain cities to provide and maintain public parks for the use of the inhabitants thereof," approved April 24, 1899, as amended,[1] may continue to expend money for the designated purpose without submitting the question to the electors for approval under sections 52—8 and 52—9.
[1] Sections 562, 563 of this chapter, repealed.

**52—9.** § 52—9. **May borrow money and levy tax.)** A specified city may borrow money and levy and collect a general tax for the purpose of providing public parks for the use of the city's inhabitants or for the purpose of enclosing, improving, and maintaining them in the same manner as for the purpose of purchasing and maintaining water works under the laws of this State. It may appropriate money for these purposes.

### ARTICLE 52.1  SPECIAL POWERS—PARKING SPACE FOR MOTOR VEHICLES

Sec.
52.1—1.   Parking facilities for motor vehicles, establishing and maintaining—bonds.
52.1—2.   Bonds—interest—sale—payable from revenue.
52.1—3.   Ordinance relating to parking facilities.
52.1—4.   Charges and fees for parking facilities.
52.1—5.   Revenues when revenue bonds are issued.
52.1—6.   Bondholders' remedies.
52.1—7.   Rules and regulations.
52.1—8.   Lease of parking facilities.
52.1—9.   Proprietary activities other than parking of motor vehicles unauthorized.
52.1—10.  Expenditures by municipalities over 500,000 except from revenue bonds or revenue unauthorized.

**52.1—1** **Parking facilities for motor vehicles, establishing and maintaining—Bonds.]** § 52.1—1. Any municipality is hereby authorized to:

(a) Acquire by purchase or otherwise, own, construct, equip, manage, control, erect, maintain and operate motor vehicle parking lot or lots, garage or garages, parking meters, and any other revenue producing facilities necessary or incidental to the regulation, control and parking of motor vehicles (hereinafter referred to as parking facilities), as the corporate authorities may from time to time find the necessity therefor exists, and for that purpose may acquire property of any and every kind or description, whether real, personal or mixed, by gift, purchase or otherwise; provided that any municipality which now or hereafter provides for the creation of a plan commission under Article 53 of this Act[1] shall submit to and receive the approval of the plan commission before establishing or operating any parking facilities as provided in this Article.

(b) Maintain and operate any such parking facilities and to charge for the use thereof;

(c) Enter into contracts dealing in any manner with the objects and purposes of this Article;

(d) Acquire sites, buildings and facilities by gift, lease, contract, purchase or condemnation under power of eminent domain, and to pledge the revenues thereof for the payment of any bonds issued for such purpose as provided in this Article. In all cases where property or rights are acquired or sought to be acquired by condemnation the procedure shall be, as nearly as may be, like that provided for in an act entitled "An Act to provide for the exercise of the right of eminent domain," approved April 10, 1872, as amended,[2] and as may hereafter be amended;

(e) Borrow money and issue and sell bonds in such amount or amounts as the corporate authorities may determine for the purpose of acquiring, completing, erecting, constructing, equipping, maintaining or operating any or all such parking facilities, and to refund and refinance the same from time to time as often as it shall be advantageous and to the public interest to do so. As amended

by act approved July 2, 1947. L.1947, p. ——, S. B.No.42.

1 Section 53—1 et seq. of this chapter.
2 Chapter 47, § 1 et seq.
Section added: L.1943, vol. 1, p. 420.

**52.1—2 Bonds—Interest—Sale—Payable from revenue.]** § 52.1—2. All bonds issued under authority of this Article shall bear interest at not more than six per cent (6%) per annum, and may be sold by the corporate authorities in such manner as they deem best in the public interest; provided, however, such bonds shall be sold at such price that the interest cost of the proceeds therefrom will not exceed six per cent (6%) per annum, based on the average maturity of such bonds, and computed according to standard tables of bond values. Such bonds shall be payable solely and only from the revenues to be derived from the operation of any such parking facilities acquired, completed, erected, constructed or equipped in whole or in part with the proceeds of such bonds, and shall be secured by a pledge of the revenues of any such parking facilities so acquired, erected, completed, constructed or equipped, as herein provided.

Such bonds when issued shall have all the qualities of negotiable instruments under the Law Merchant and the Negotiable Instrument Law. Such bonds may bear such date or dates and may mature at such time or times, not exceeding thirty years from their date or dates, and may be in such form, carry such registration privilege, may be payable at such place or places, may be subject to such terms of redemption, prior to maturity, with or without premium, as so stated on the face of the bonds, and contain such terms and covenants, all as may be provided by ordinance authorizing the issuance of such bonds. Such bonds shall be executed by such officers as the corporate authorities shall designate in the said ordinance. Any bonds bearing the signatures of officers in office at the date of signing thereof shall be valid and binding for all purposes, notwithstanding that before delivery thereof any or all such persons whose signatures appear thereon shall cease to be such officers.

Each such bond shall state upon its face that it is payable solely and only from the proceeds derived from the operation of the parking facility or facilities constructed, acquired, erected, completed or equipped with the proceeds of the sale of said bonds, and shall state upon its face that it does not constitute an obligation of the city, village or incorporated town within the meaning of any constitutional or statutory limitation or provision. Added by act approved July 2, 1947. L.1947, p. ——, S.B.No.42.

**52.1—3 Ordinance relating to parking facilities.]** § 52.1—3. The corporate authorities of any such municipality availing of the provisions of this Article shall adopt an ordinance describing in a general way the contemplated project and refer to plans and specifications therefor, which shall be placed on file in the office of the Clerk of such municipality, and which shall be open for the inspection of the public. Such ordinance shall state the estimated cost of such project, fix the amount of the revenue bonds proposed to be issued, the maturity or maturities, the interest rate, and all details in respect thereof. Such ordinance shall contain such covenants and restrictions as may be deemed necessary or advisable by the corporate authorities, and without limiting the generality of the foregoing, such ordinance shall contain such covenants as may be determined by the corporate authorities as to:

(a) The issuance of additional bonds that may thereafter be issued payable from the revenues derived from the operation of any such parking facilities and for the payment of the principal and interest upon such bonds;

(b) The regulation as to the use of any such parking facilities to assure the maximum use or occupancy thereof;

(c) The kind and amount of insurance to be carried, including use and occupancy insurance, the cost of which shall be payable only from the revenues to be derived from the project;

(d) Operation, maintenance, management, accounting and auditing, and the keeping of records, reports and audits of any such parking facilities;

(e) The obligation of the municipality to maintain the project in good condition and to operate the same at an economical and efficient manner;

(f) Such other covenants as may be deemed necessary or desirable to assure a successful and profitable operation of the project and prompt payment of principal of and interest upon the said bonds so authorized.

After said ordinance has been adopted and approved, it shall be published once in a newspaper published and having general circulation in such municipality, or if there be no such newspaper published in such municipality, then the ordinance should be posted in at least five of the most public places in such municipality, and shall become effective ten days after publication or posting thereof. Added by act approved July 2, 1947. L.1947, p. ——, S.B.No. 42.

**52.1—4 Charges and fees for parking facilities.]** § 52.1—4. Whenever bonds are issued as provided by this Article it shall be the duty of the corporate authorities to establish charges and fees for the use of any such parking facilities sufficient at all times to pay maintenance and operation costs, and principal of and interest upon such bonds, and all revenues derived from the operation thereof shall be set aside as a separate fund and account and used only as hereinafter provided. Added by act approved July 2, 1947. L.1947, p. ——, S.B.No. 42.

**52.1—5 Revenues when revenue bonds are issued.]** § 52.1—5. Whenever revenue bonds are issued under this Article, the revenues derived from the operation of the project shall be set aside as collected and be deposited in a separate fund, separate and apart from all other funds of such municipality, and be used in paying the cost of maintenance and operation, paying the principal of and interest upon the bonds of such municipality, issued under this Article, and for the transfer of any surplus amounts annually to the general corporate fund of any such municipality only when and in the manner permitted and authorized in accordance with the covenants and provisions and terms of the ordinance authorizing the issuance of any such bonds under the provisions of this Article. Added by act approved July 2, 1947. L. 1947, p. ——, S.B.No. 42.

**52.1—6 Bondholders' remedies.]** § 52.1—6. The provisions of this Article and of any ordinance or other proceeding authorizing the issuance of bonds under this Article shall constitute a contract with the holders of such bonds, and any holder of a bond or bonds, or any of the coupons of any bond or bonds of such municipality, issued under this Article, may either in law or in equity, by suit, action, mandamus or other proceeding, enforce and compel the performance of all duties required by this Article, including the making and collecting of sufficient charges and fees for service and use thereof, and the application of income and revenue thereof. Added by act approved July 2, 1947. L.1947, p. ——, S.B.No. 42.

**52.1—7 Rules and regulations.]** § 52.1—7. The corporate authorities of any municipality are hereby granted authority to make all reasonable rules and regulations not in conflict with the laws of this state or the ordinances of such municipality

regarding the management and control and use of any such parking facility or facilities. Added by act approved July 2, 1947. L.1947, p. ——, S.B.No. 42.

**52.1—8 Lease of parking facilities.]** § 52.1—8. The corporate authorities of any such municipality availing of the provisions of this Article are hereby given the authority to lease all or any part of any such parking facilities, and to fix and collect the rentals therefor, and to fix, charge and collect rentals, fees and charges to be paid for the use of the whole or any part of any such parking facilities, and to make contracts for the operation and management of the same, and to provide for the use, management and operation of such lots through lease or by its own employees, or otherwise; provided, however, that no lease for the operation or management of any such parking facilities shall be made for more than one year, except to the highest and best bidder after notice requesting bids shall have been given by at least one publication in some newspaper of general circulation published in such municipality, such publication to be made once each week for at least two weeks before the date of receiving bids therefor. All income and revenue derived from any such lease or contract shall be deposited in a separate account and used solely and only for the purpose of maintaining and operating the project, and paying the principal of and interest on any bonds issued pursuant to authorize under the provisions of this Article. Further any contract or obligation involving the borrowing of money for such purposes, incurred by any such municipality in the maintenance and operation of any such parking facilities shall be payable solely and only from the revenues derived from the operation of the project. Added by act approved July 2, 1947. L. 1947, p. ——, S.B.No. 42.

**52.1—9 Proprietary activities other than parking of motor vehicles unauthorized.]** § 52.1—9. This Article shall not be construed as authorizing any municipality to engage in any proprietary activity at or with any such parking facilities other than the parking of motor vehicles. Added by act approved July 2, 1947. L.1947, p. ——, S.B.No. 42.

**52.1—10 Expenditures by municipalities over 500,000 except from revenue bonds or revenue unauthorized.]** § 52.1—10. This act[1] shall not be construed as authorizing any municipality having a population of 500,000 or more inhabitants to make any expenditure under this Article except from revenue bonds as above provided or from revenues derived from the operation of parking facilities. Added by act approved July 2, 1947. L.1947, p. ——, S.B.No. 42.
[1] Sections 52.1–1 to 52.1–10 of this chapter.

### ARTICLE 53.  SPECIAL POWERS—PLAN COMMISSION

Sec.
53—1. Creation of plan commission—zoning commission may act as.
53—2. Powers of plan commission.
53—3. Maps and plats conform to plan.

**53—1. § 53—1. Creation of plan commission—Zoning commission may act as.]** Every municipality has the power to provide for the creation of a plan commission. The plan commission shall consist of a chairman and such other members appointed in such manner and serving for such terms as the corporate authorities of the municipality may prescribe by ordinance, except that the mayor, or president, of the municipality, and the president of the board of local improvements shall be members ex-officio of the commission. If there is a zoning commission in a municipality at the time the municipality provides for the creation of a plan commission, the zoning commission, in the discretion of the corporate au-

thorities, may be designated as the plan commission under this article. Any plan commission now existing and officially recognized by the corporate authorities in any municipality may exercise all the powers conferred upon plan commissions by this article fully as if it had been created hereunder, but if any changes in the membership of that plan commission are necessary to bring it into conformity with this section, those changes shall be made.

**53—2. § 53—2. Powers of plan commission.)** Every plan commission authorized by this article has the power:

(1) To prepare and recommend to the corporate authorities a comprehensive plan of public improvements looking to the present and future development of the municipality. After its adoption by the corporate authorities, this plan shall be known as the official plan of that municipality. Thereafter from time to time the plan commission may recommend changes in the official plan. This plan may include reasonable requirements with reference to streets, alleys, and public grounds in unsubdivided land situated within the corporate limits or in contiguous territory not more than one and one-half miles beyond the corporate limits and not included in any municipality. These requirements shall be effective whenever this unsubdivided land is subdivided after the adoption of the official plan.

(2) To prepare and recommend to the corporate authorities from time to time, plans for specific improvements in pursuance of the official plan.

(3) To give aid to the municipal officials charged with the direction of projects for improvements embraced within the official plan, to further the making of these projects, and generally to promote the realization of the official plan.

(4) To exercise such other powers, germane to the powers granted by this article, as may be conferred by the corporate authorities.

**53—3. § 53—3. Maps and plats conform to plan.)** No map or plat of any subdivision presented for record, affecting land (1) within the corporate limits of any municipality which has adopted heretofore or shall adopt hereafter an official plan in the manner prescribed in this article, or (2) within contiguous territory which is not more than one and one-half miles beyond the corporate limits of an adopting municipality, and not included in any municipality, shall be entitled to record or shall be valid unless the subdivision shown thereon provides for streets, alleys, and public grounds in conformity with the applicable requirements of the official plan.

### ARTICLE 53.1  SPECIAL POWERS— POLICE PROTECTION

Sec.
53.1—1 Special tax for police protection.
53.1—2 Referendum.

**53.1—1. § 53.1—1. Special tax for police protection.]** The corporate authorities of any city or village containing less than 500,000 inhabitants may levy, annually, a tax of not to exceed .075 per cent of the full, fair cash value, as equalized or assessed by the Department of Revenue, of all taxable property therein, for the current year, to provide revenue for the purpose of police protection in that municipality. This tax shall be in addition to all taxes authorized by law to be levied and collected in that municipality and shall be in addition to the amount authorized to be levied for general purposes as provided by section 16—1.

This section is subject to the provisions of the General Revenue Law of Illinois. As amended by act approved July 21, 1947. L.1947, p. ——, H.B. No. 906.

**53.1—2. § 53.1—2. Referendum.]** This article shall not be in force in any municipality until the question of its adoption is submitted to the electors of that municipality and approved by a majority

# LAWS

OF THE

## STATE OF ILLINOIS

ENACTED BY THE

## SEVENTY - SECOND
## GENERAL ASSEMBLY

AT THE

## REGULAR BIENNIAL SESSION

BEGUN AND HELD AT THE CAPITOL, IN THE CITY OF
SPRINGFIELD, ON THE FOURTH DAY OF JANUARY
A. D. 1961, AND ADJOURNED ON THE
THIRTIETH DAY OF JUNE, A. D. 1961



## Volume I

(Printed by authority of the General Assembly of the State of Illinois.)

1210

station, fire department house, or public library is destroyed or seriously impaired by cyclone or tornado, the city council, in order to rebuild or restore any such building, thus destroyed or seriously impaired, may levy an annual tax for not exceeding 10 successive years of not exceeding .08333% of the full, fair cash value, as equalized or assessed by the Department of Revenue, on all of the taxable property in the city. This tax shall be levied and collected in the same manner as the general taxes of that city and shall be known as the public building restoration fund tax. This tax shall not be included in the aggregate amount of taxes as limited by Section 8-3-1, or by any provision of any special charter under which such a city is now operating.

This section, insofar as it is applicable to municipalities of less than 500,000 population, is subject to the provisions of the General Revenue Law of Illinois.

§ 11-70-2. Whenever the city council of any city designated in Section 11-70-1 decides to rebuild or restore any of the specified buildings, it shall make provision therefore by an ordinance. This ordinance shall also state the number of years, not exceeding 10, that this annual public building restoration fund tax shall be levied, and the per cent, not exceeding .08333 on all of the taxable property in the city. This tax shall be included in the annual appropriation and tax levy ordinances of such a city for the years that it can be levied under the provisions of this section and Section 11-70-1.

This section, insofar as it is applicable to municipalities of less than 500,000 population, is subject to the provisions of the General Revenue Law of Illinois.

§ 11-70-3. All money received from this public building restoration fund tax shall be deposited in the city treasury to the credit of that fund. All money so received shall be kept separate and apart from other money of the city, and shall not be used or paid out for any other purpose than that of paying the cost of rebuilding or restoring the specified public buildings destroyed or seriously impaired by cyclone or tornado, until all of the costs have been discharged. If the money so received can not be used annually to pay the cost but accumulates, the city council may invest this money in good interest-paying securities, until the money is needed for the payment of the costs of the rebuilding or restoration.

PARKING FACILITIES

DIVISION 71. OFF-STREET PARKING

§ 11-71-1. Any municipality is hereby authorized to:

(a) Acquire by purchase or otherwise, own, construct, equip, manage, control, erect, improve, extend, maintain and operate motor vehicle parking lot or lots, garage or garages, parking meters, and

any other revenue producing facilities, hereafter referred to as parking facilities, necessary or incidental to the regulation, control and parking of motor vehicles, as the corporate authorities may from time to time find the necessity therefor exists, and for that purpose may acquire property of any and every kind or description, whether real, personal or mixed, by gift, purchase or otherwise. Any municipality which has provided or does provide for the creation of a plan commission under Division 12 of this Article 11 shall submit to and receive the approval of the plan commission before establishing or operating any such parking facilities;

(b) Maintain, improve, extend and operate any such parking facilities and charge for the use thereof;

(c) Enter into contracts dealing in any manner with the objects and purposes of this Division 71, including the leasing of space on, or in connection with, parking meters for advertising purposes. Any contract for such advertising shall prohibit any interference with traffic control, shall prohibit placing any advertising sign or device on parking meters that exceeds the dimensions of 8 by 12 inches and shall contain such other provisions as the corporate authorities deem necessary in the public interest. All revenues derived from any such contract shall be used exclusively for traffic regulation and maintenance of streets within the municipality.

(d) Acquire sites, buildings and facilities by gift, lease, contract, purchase or condemnation under power of eminent domain, and pledge the revenues thereof for the payment of any bonds issued for such purpose as provided in this Division 71. In all cases where property or rights are acquired or sought to be acquired by condemnation, the procedure shall be, as nearly as may be, like that provided for in an act entitled "An Act to provide for the exercise of the right of eminent domain", approved April 10, 1872, as heretofore and hereafter amended;

(e) Borrow money and issue and sell bonds in such amount or amounts as the corporate authorities may determine for the purpose of acquiring, completing, erecting, constructing, equipping, improving, extending, maintaining or operating any or all of its parking facilities, and refund and refinance the same from time to time as often as it shall be advantageous and to the public interest to do so.

§ 11-71-2. All bonds issued under authority of this Division 71 shall bear interest at not more than 6% per annum, and may be sold by the corporate authorities in such manner as they deem best in the public interest. However, such bonds shall be sold at such price that the interest cost of the proceeds therefrom will not exceed 6% per annum, based on the average maturity of such bonds, and computed according to standard tables of bond values. Such bonds shall be payable solely and only from the revenues to be derived from the operation of any or all of its parking facilities and shall be

secured by a pledge of the revenues of any or all of its parking facilities except as otherwise provided in paragraph (c) of Section 11-71-1.

Such bonds when issued shall have all the qualities of negotiable instruments under the Law Merchant and the Negotiable Instrument Law. Such bonds may bear such date or dates and may mature at such time or times, not exceeding 30 years from their date or dates, and may be in such form, carry such registration privilege, may be payable at such place or places, may be subject to such terms of redemption, prior to maturity, with or without premium, as so stated on the face of the bond, and contain such terms and covenants, all as may be provided by ordinance authorizing issuance of such bonds. Such bonds shall be executed by such officers as the corporate authorities shall designate in the ordinance. Any bonds bearing the signatures of officers in office at the date of signing thereof shall be valid and binding for all purposes, notwithstanding that before delivery thereof any or all such persons whose signatures appear thereon shall cease to be such officers.

Each such bond shall state upon its face that it is payable solely and only from the proceeds derived from the operation of the parking facility or facilities, except as otherwise provided in paragraph (c) of Section 11-71-1, and shall state upon its face that it does not constitute an obligation of the municipality within the meaning of any constitutional or statutory limitation or provision.

§ 11-71-3.  The corporate authorities of any such municipality availing of the provisions of this Division 71, other than that concerning advertising on parking meters, shall adopt an ordinance describing in a general way the contemplated project and refer to plans and specifications therefor, which shall be placed on file in the office of the clerk of such municipality, and which shall be open for the inspection of the public. Such ordinance shall state the estimated cost of such project, fix the amount of the revenue bonds proposed to be issued, the maturity or maturities, the interest rate, and all details in respect thereof. Such ordinance shall contain such covenants and restrictions as may be deemed necessary or advisable by the corporate authorities, and without limiting the generality of the foregoing, such ordinance shall contain such covenants as may be determined by the corporate authorities as to:

(a)  The issuance of additional bonds that may thereafter be issued payable from the revenues derived from the operation of any such parking facilities and for the payment of the principal and interest upon such bonds.

(b)  The regulation as to the use of any such parking facilities to assure the maximum use or occupancy thereof;

(c)   The kind and amount of insurance to be carried, including use and occupancy insurance, the cost of which shall be payable only from the revenues to be derived from the project;

(d)   Operation, maintenance, management, accounting and auditing, and the keeping of records, reports and audits of any such parking facilities;

(e)   The obligation of the municipality to maintain the project in good condition and to operate the same in an economical and efficient manner;

(f)   Such other covenants as may be deemed necessary or desirable to assure a successful and profitable operation of the project and prompt payment of principal of and interest upon the bonds so authorized.

After the ordinance has been adopted and approved, it shall be published once in a newspaper published and having general circulation in such municipality, or if there be no such newspaper published in such municipality, then the ordinance should be posted in at least 5 of the most public places in such municipality, and shall become effective 10 days after publication or posting thereof.

§ 11-71-4.   Whenever bonds are issued as provided by this Division 71, it shall be the duty of the corporate authorities to establish charges and fees for the use of any such parking facilities sufficient at all times to pay maintenance and operation costs, and principal of and interest upon such bonds, and all revenues derived from the operation thereof shall be set aside as a separate fund and account and used only as hereinafter provided, except as otherwise provided in paragraph (c) of Section 11-71-1.

§ 11-71-5.   Whenever revenue bonds are issued under this Division 71, the revenues derived from the operation of the project, except as otherwise provided in paragraph (c) of Section 11-71-1, shall be set aside as collected and be deposited in a separate fund, separate and apart from all other funds of such municipality, and be used in paying the cost of maintenance and operation, paying the principal of and interest upon the bonds of such municipality, issued under this Division 71, and for the transfer of any surplus amounts annually to the general corporate fund of any such municipality only when and in the manner permitted and authorized in accordance with the covenants and provisions and terms of the ordinance authorizing the issuance of any such bonds under the provisions of this Division 71.

§ 11-71-6.   The provisions of this Division 71 and of any ordinance or other proceeding authorizing the issuance of bonds under this Division 71 shall constitute a contract with the holders of such bonds, and any holder of a bond or bonds, or any of the coupons of any bond or bonds of such municipality, issued under this Division 71, may either in law or in equity, by suit, action, mandamus or other proceeding, enforce and compel the performance of all duties

required by this Division 71, including the making and collecting of sufficient charges and fees for service and use thereof, and the application of income and revenue thereof.

§ 11-71-7.  The corporate authorities of any municipality are hereby granted authority to make all reasonable rules and regulations not in conflict with the laws of this state or the ordinances of such municipality regarding the management and control and use of any such parking facility or facilities.

§ 11-71-8.  The corporate authorities of any such municipality availing of the provisions of this Division 71 are hereby given the authority to lease all or any part of any such parking facilities, and to fix and collect the rentals therefor, and to fix, charge and collect rentals, fees and charges to be paid for the use of the whole or any part of any such parking facilities, and to make contracts for the operation and management of the same, and to provide for the use, management and operation of such lots through lease or by its own employees, or otherwise.  However, no lease for the operation or management of any such parking facilities shall be made for more than one year, except to the highest and best bidder after notice requesting bids shall have been given by at least one publication in some newspaper of general circulation published in such municipality, such publication to be made once each week for at least 2 weeks before the date of receiving bids therefor.  All income and revenue derived from any such lease or contract shall be deposited in a separate account and used solely and only for the purpose of maintaining and operating the project, and paying the principal of and interest on any bonds issued pursuant to ordinance under the provisions of this Division 71. Further any contract or obligation involving the borrowing of money for such purposes, incurred by any such municipality in the maintenance and operation of any such parking facilities shall be payable solely and only from the revenues derived from the operation of the project.

§ 11-71-9.  Except as otherwise provided in paragraph (c) of Section 11-71-1, this Division 71 shall not be construed as authorizing any municipality to engage in any proprietary activity at or with any such parking facilities other than the parking of motor vehicles.

§ 11-71-10.  This Division 71 shall not be construed as authorizing any municipality having a population of 500,000 or more inhabitants to make any expenditure under this Division 71 except from revenue bonds as above provided or from revenues derived from the operation of parking facilities.

## TREES AND FORESTRY

## DIVISION 72. PLANTING OF TREES

§ 11-72-1.  The corporate authorities of each municipality may plant trees upon the streets and other municipal property.