CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-1166

MICAH UETRICHT and JOHN KADERBEK,

*Plaintiffs-Appellants*,

*v.*

CHICAGO PARKING METERS, LLC,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 21 C 3364 — **Matthew F. Kennelly**, *Judge*.

———————————

ARGUED SEPTEMBER 22, 2022 — DECIDED APRIL 7, 2023

———————————

Before WOOD, HAMILTON, and ST. EVE, *Circuit Judges*.

WOOD, *Circuit Judge*. Desperate to find untapped sources
of funds during the recession of 2008, the City of Chicago re-
alized that it would need to think outside the box. It faced a
$150 million shortfall in revenue, see Office of the Inspector
General of the City of Chicago, An Analysis of the Lease of the
City's Parking Meters 13–14 (2009), available at
http://dig.abclocal.go.com/wls/documents/060209parking-
meter.pdf, and it emphatically did not want to bridge the gap

with a large and deeply unpopular tax increase. As it looked around for an alternative way to find the necessary money, its eyes fell on city-controlled metered street parking. Realizing that this was an asset it could monetize, it ended up awarding a 75-year Concession over designated parking spaces to the private firm Chicago Parking Meters, LLC ("CPM"), which agreed to give the City an upfront cash payment of more than a billion dollars in exchange.

After the City Council approved the new arrangement and CPM took over, the price of parking in the areas covered by the Concession shot upward, quickly more than doubling. Litigation in both state court and federal court followed. Although it is of no direct relevance to our case, we note that the Illinois Appellate Court has upheld the arrangement. See *Indep. Voters of Illinois Indep. Precinct Org. v. Ahmad*, 2014 IL App (1st) 123629. On the federal side, the plaintiffs now before us filed an action against CPM both for themselves and on behalf of a class. Describing themselves as two car drivers who live in Chicago, they assert that CPM has violated the federal antitrust laws, as well as the Illinois Consumer Fraud and Deceptive Practices Act. See 15 U.S.C. §§ 1, 2; 815 ILCS 805. They did not name the City as a codefendant. The district court never ruled on the class allegations. Instead, it dismissed plaintiffs' antitrust theories for failure to state a claim, on the ground that they were barred by the state-action immunity doctrine of *Parker v. Brown*, 317 U.S. 341 (1943); it then relinquished jurisdiction over the supplemental state-law count.

We affirm. The Concession represents no more or less than a use of municipal authority to substitute, during the term of the lease, exclusive private operation for direct city operation of specified areas of Chicago's on-street parking facilities. Put

differently, it swaps one "monopolist" (the City) for another (CPM). We're not so sure, by the way, that there is anything here that the antitrust laws would recognize as a monopoly. The Illinois Secretary of State reports that there are more than a million passenger vehicles in the City, see *Active Registration Counts – City of Chicago County*, Ill. Sec'y of State (last visited Mar. 3, 2023), https://www.ilsos.gov/departments/vehicles/statistics/lpcountycounts/COUNTY103.PDF, and those cars can be found in apartment building parking garages, private residential garages, private lots, public lots, unregulated streets, and, of course, metered parking. Nonetheless, for present purposes we will assume that plaintiffs are correct and that the metered spaces at issue fall into a distinct market that has been monopolized. The critical point is that the City had the necessary authority to enter into this arrangement. Our independent review of the Concession Agreement (which is attached to the complaint, see Fed. R. Civ. P. 10(c)) satisfies us that the City has reserved meaningful powers to oversee and regulate CPM's performance. The deal itself might have been foolish, short-sighted, or worse, and if one is to believe news reports, it may have saddled Chicago with the most expensive street parking in the country, see Tania Babich, *Chicago parking most expensive in U.S.*, ABC7 Chicago (July 12, 2017), but that is not enough to state a claim for a violation of the antitrust laws.

## I

There is not much to add about the events underlying this litigation. After the City decided to privatize certain on-street metered parking through a long-term lease, it put out a request for bids. Ten applicants responded, of which eight were deemed qualified. See An Analysis of the Lease of the City's

Parking Meters, *supra*, at 12 (2009). CPM was the winning bidder. It offered to pay the City $1,156,500,000 in cash in exchange for the exclusive right to operate and collect revenue from the City's network of metered parking. This represented approximately 36,000 parking spots located in business and commercial areas. The term of the Agreement, as we said, is 75 years. Plaintiffs assert that just 14 years into that term, CPM has already recouped its initial investment, and that it is now looking forward to another 60 years or so of monopoly profits.

On December 4, 2008, the City Council passed an ordinance authorizing the Mayor and the Chief Financial Officer to execute the Agreement. The ordinance stated that the Concession was "in the best interest of the residents of the City and desirable for the welfare of its government and affairs." Chicago, IL, Authorization for Execution of Concession and Lease Agreement and Amendment of Titles 2, 3, 9 and 10 of Municipal Code of Chicago in Connection with Chicago Metered Parking System (Dec. 14, 2008), available at https://www.chicago.gov/content/dam/city/depts/rev/supp_info/ParkingMeter/MeteredParkingSystemOrdinance.pdf. Plaintiffs do not challenge the process by which the Agreement was adopted.

Although the Agreement has been amended a couple of times since it took effect (most recently in 2013), the key provisions have not changed. We review them briefly and rely on them in our *de novo* assessment of the complaint. The Agreement gives CPM "the right to operate, maintain and improve the Metered Parking System, to retain the revenues to be derived from the operation of the Concession Metered Parking Spaces and to be compensated for the operation of Reserve Metered Parking Spaces for the Term of the Agreement,

subject to the reserved police powers and regulatory powers of the City with respect to the Metered Parking System … ."

Note that there are two kinds of parking spaces covered by the Agreement: the "Concession" spaces and the "Reserve" spaces. Those terms are defined (along with many more) in Article I, section 1.1, of the Agreement. The two types of spaces are described as follows:

> "<u>Concession Metered Parking Spaces</u>" means (i) those Metered Parking Spaces so designated by the City from time to time and included in the Metered Parking System operated and maintained by the Concessionaire pursuant to this Agreement, (ii) … the Metered Parking Spaces listed in <u>Amended Schedule 10</u> and designated thereon as Concession Metered Parking Spaces, and (iii) … the Metered Parking Spaces located in the Parking Lots listed on <u>Revised Schedule 10A</u>.
>
> …
>
> "<u>Reserve Metered Parking Spaces</u>" means those Metered Parking Spaces so designated by the City that the Concessionaire operates and maintains on behalf of the City pursuant and with respect to which the City is paid the net Metered Parking Revenues.

CPM is entitled to all of the revenue generated by the Concession Spaces, while the City is entitled to 85% of the net revenue attributable to the Reserve Spaces. CPM operates and maintains both types of parking spaces. The City is entitled to designate, add, and remove any kind of metered space, but if the average daily number of Concession Spaces falls below 30,000 for a reporting year, the City must pay CPM an amount

equal to the reduction in the fair market value of CPM's inter-
est in the Concession.

Section 1.1 defines the City's "Reserved Powers" as fol-
lows:

> [T]he exercise by the City of those police and regula-
> tory powers with respect to Metered Parking Spaces,
> including Concession Metered Parking Spaces and Re-
> serve Metered Parking Spaces, and the regulation of
> traffic, traffic control and the use of the public way in-
> cluding the exclusive and reserved rights of the City to
> (i) designate the number and location of Metered Park-
> ing Spaces and to add and remove Metered Parking
> Spaces; (ii) establish and revise from time to time the
> schedule of Metered Parking Fees for the use of Me-
> tered Parking Spaces; (iii) establish and revise from
> time to time the Periods of Operation and Periods of
> Stay of Metered Parking Spaces; (iv) establish a sched-
> ule of fines for parking violations; (v) administer a sys-
> tem for the adjudication and enforcement of parking
> violations and the collection of parking violation fines
> and (vi) establish and administer peak period pricing,
> congestion pricing or other similar plans.

See also Concession Agreement § 7.2. The City did not, how-
ever, have the right to take those steps without financial con-
sequences. The Agreement designates a number of "compen-
sation events" that trigger an obligation on the City's part to
pay CPM. (The parties refer to these as "true-up payments.")
The list includes a reduction in fees, a failure to adjust fees for
inflation, a reduction in the number of Concession Spaces, the
addition of competing public parking facilities within a cer-
tain distance, or broadly speaking any exercise of the City's

reserved powers that "may have a material adverse effect on the fair market value of the Concessionaire Interest." If the City exercises its right to terminate the Agreement, it must pay CPM for any loss in value that ensues. Plaintiffs assert that these financial consequences are so draconian that they mean, in effect, that the City's reserved powers are illusory.

Insofar as plaintiffs are saying that there are robust protections in the Agreement designed to protect the deal CPM struck, they are not wrong. Nonetheless, the record shows that the City has exercised its reserved powers on several occasions, and it has made the required payments to CPM. Media sources indicate that in 2016, the City added 752 metered spaces in the central area during Mayor Emmanuel's term, and an article published in 2022 asserted that 1,800 parking meters had been added since Mayor Lightfoot took office. See John Byrne, *1,800 parking meters added since Chicago Mayor Lightfoot took office*, THE PANTAGRAPH (Aug. 15, 2022); Fran Spielman, *Emanuel adding 752 metered parking spaces in central area*, CHICAGO SUN TIMES (Nov. 4, 2016). More significantly, from plaintiffs' perspective, are the yearly true-up payments that Chicago has made to CPM over the years. Based on publicly filed audited financial statements, it appears that CPM has recognized $151,660,810 in true-up revenue since 2009:

| YEAR | PAYMENT |
|------|---------|
| 2009 | $533,330 |
| 2010 | $1,658,036 |
| 2011 | $14,134,842 |
| 2012 | $26,738,664 |
| 2013 | $14,617,084 |

| | |
|------|------------|
| 2014 | $6,481,150 |
| 2015 | $8,637,891 |
| 2016 | $15,740,662 |
| 2017 | $21,736,219 |
| 2018 | $17,371,527 |
| 2019 | $11,037,684 |
| 2020 | $6,250,836 |
| 2021 | $6,722,885 |

These are not trivial amounts, and so we accept plaintiffs' contention that the City must think twice, or three times, before it exercises reserved powers that give rise to compensation for CPM.

There is much more to the Agreement, which as amended runs more than 230 pages, but most of it is not pertinent to our case. The central issue is whether, as the district court believed, this arrangement is categorically outside the reach of the federal antitrust laws because it represents state action, or if it fails to satisfy the criteria for state-action immunity and thus must be returned to the district court for further proceedings. We begin by reviewing the state-action doctrine, especially as applied to actions taken by municipalities, and we then examine its application to this Agreement.

## II

At the time Congress passed the Sherman Act in 1890, the Supreme Court had a narrow view of Congress's power under the Commerce Clause of Article I. "Commerce" did not cover intrastate activity, such as manufacturing, see *United States v. E.C. Knight Co.*, 156 U.S. 1 (1895), and it did not

include purely internal transactions, see *Gibbons v. Ogden*, 22 U.S. 1 (1824). But as the Supreme Court's understanding of the scope of the commerce power expanded during the 1930s, the substantive reach of the Sherman Act followed suit. By 1942, the Court had repudiated the narrow view of Congress's power to regulate interstate commerce reflected in *E.C. Knight* and had adopted the position that anything affecting interstate commerce was also "a proper subject of federal regulation." *Wickard v. Filburn*, 317 U.S. 111, 122 (1942). Two years later, the Court confirmed that the Sherman Act has expanded along with the Commerce Clause:

> We have been shown not one piece of reliable evidence that the Congress of 1890 intended to freeze the proscription of the Sherman Act within the mold of then current judicial decisions defining the commerce power. On the contrary, all the acceptable evidence points the other way. That Congress wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements … .

*United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 557 (1944) (addressing whether the Sherman Act reaches interstate insurance transactions; later superseded by the McCarran-Ferguson Act on the specific question whether contracts of insurance fell within the Sherman Act).

In the midst of these developments in the general scope of the Sherman Act came a case posing questions of federalism: *Parker v. Brown*. The state of California had adopted a marketing program for the 1940 raisin crop pursuant to a state law designed to restrict competition and prop up the price of raisins. The vast majority of California's raisins—90 to 95 percent—were shipped outside the state. All raisins were subject

to an elaborate allocation system, under which the producers classified them, allocated 50 percent of the crop to a "stabilization pool," held back another 20 percent in a "surplus pool," and sold the remaining 30 percent. Violations of the system were punished as misdemeanors.

One grower, who wanted to sell more than the system would permit, sued California's Director of Agriculture and other responsible officials. He asserted violations of the Sherman Act, the Agricultural Marketing Agreement Act of 1937, and the Commerce Clause. He prevailed before a three-judge court on his Commerce-Clause theory, but the Supreme Court reversed. The part of the Court's opinion of interest for our purposes is its analysis of the "validity of the prorate program under the Sherman Act." *Parker*, 317 U.S. at 350. The Court began with two critical points:

> We may assume for present purposes that the California prorate program would violate the Sherman Act if it were organized and made effective solely by virtue of a contract, combination or conspiracy of private persons, individual or corporate. We may assume also, without deciding, that Congress could, in the exercise of its commerce power, prohibit a state from maintaining a stabilization program like the present because of its effect on interstate commerce.

*Id.* The first assumption introduced the idea that state action is not subject to the same rules as private action. The second assumption accepted that Congress could, if it wished, override state legislation that is inconsistent with the Sherman Act. The question before the Court was whether Congress had done so.

In reaching its ultimate conclusion, the Court relied in part on the fact that the Sherman Act has nothing to say on the question whether states fall within the definition of the "persons" who are subject to the law. It found significance in this silence, on the theory that such an important intrusion on the states' power to regulate their own economies would have been addressed expressly. Looking to "the purpose, the subject matter, the context and the legislative history of the statute," the Court was persuaded that the Sherman Act was not intended to, and did not, reach state action. *Id.* at 351. It found instead that "the state command to the Commission and to the program committee of the California Prorate Act is not rendered unlawful by the Sherman Act since, in view of the latter's words and history, it must be taken to be a prohibition of individual and not state action." *Id.* at 352. Such a restraint was simply one "which the Sherman Act did not undertake to prohibit." *Id.* Indeed, given the contemporary understanding of the Commerce Clause in 1890, and the fact that Congress passed the Sherman Act pursuant to that power, it is possible that the drafters would have thought that state laws limited to intrastate matters were outside the scope of the Commerce Clause, and for that reason alone were not preempted.

The next important development in the state-action exemption recognized by *Parker* came in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980). Ever since *Parker*, it had been understood that a state could not simply announce that the Sherman Act did not apply within its borders, but it was not clear what a state needed to do in order to obtain *Parker* protection for a local economic program. In *Midcal*, a wine distributor brought an antitrust challenge to California's state-imposed system of resale price maintenance and price posting for the wholesale wine trade.

The state court of appeal enjoined the pricing arrangement on the ground that it violated the Sherman Act and was not entitled to *Parker* immunity.

The Supreme Court affirmed. In so doing, it introduced a two-part test for state-action immunity: "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself." *Midcal*, 445 U.S. at 105 (quotations omitted). Although the California system satisfied the first of those criteria, it flunked the second one. It was not enough, the Court held, for the state simply to authorize price-fixing on the part of private parties and to enforce the resulting prices. An express state policy substituting regulation for competition was required instead, coupled with active state supervision of the regulated party.

The next question to arise related to the way in which these principles apply if the "state" actor is a municipality, not the state itself. In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389 (1978), and *Community Communications Co. v. City of Boulder*, 455 U.S. 40 (1982), the Supreme Court held that municipalities acting alone do not qualify as the requisite source of state law. *Lafayette* involved a municipal corporation acting pursuant to general powers delegated by the state legislature, while *Community Communications* presented the case of a city with broad home-rule powers under state law. In either instance, the Court held, only if the local action "constitutes the action of the State [ ] itself in its sovereign capacity … or unless it constitutes municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy" is *Parker* immunity available. *Community Communications*, 455 U.S. at 52.

It soon turned out that municipalities, while not the same as states, are also not the equivalent of private actors for *Parker* purposes. In *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985), the question was how to apply the *Midcal* test—clear articulation and affirmative expression at the state-law level, coupled with active supervision—to municipalities. The Town of Hallie, Wisconsin, and three other small towns, lay just outside the borders of the City of Eau Claire. They sued the City under the antitrust laws, claiming that it was monopolizing the provision of sewage treatment services and unlawfully tying those services to the related activities of sewage collection and transportation. The district court dismissed the complaint, and this court affirmed. We held that Wisconsin law adequately conferred the right on the City either to furnish or to refuse to furnish the sewage services. The active-supervision element, however, did not follow the *Midcal* script. We reasoned that active state supervision over the municipality's actions "would erode traditional concepts of local autonomy and home rule." *Town of Hallie*, 471 U.S. at 38. This led us to conclude that active supervision is not necessary if the state regulatory scheme relies on a municipality.

The Supreme Court affirmed. It regarded this as a question of first impression—one that had been unnecessary to explore in *Lafayette* and *Community Communications*. Its ruling was unambiguous: "We now conclude that the active state supervision requirement should not be imposed in cases in which the actor is a municipality." *Id.* at 46. In so doing, it explained that the active-supervision requirement plays only an evidentiary role: it offers a way to ensure that the actor is actually engaging in the conduct at issue pursuant to state policy. *Id.* It went on to explain that

> [w]here the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

*Id.* at 47.

The last case in this line that deserves a quick look is *Federal Trade Commission v. Phoebe Putney Health System, Inc.*, 568 U.S. 216 (2013). There, the Court had to decide "whether a Georgia law that creates special-purpose public entities called hospital authorities and gives those entities general corporate powers, including the power to acquire hospitals, clearly articulates and affirmatively expresses a state policy to permit acquisitions that substantially lessen competition." *Phoebe Putney*, 568 U.S. at 219. The Court found that the Georgia law did not adequately state such a policy, and so it held that the state-action immunity from the antitrust laws (in that case, the Clayton Act § 7) did not apply. It emphasized that it "recognize[d] state-action immunity only when it is clear that the challenged anticompetitive conduct is undertaken pursuant to a regulatory scheme that is the State's own." *Id.* at 225 (quotations omitted). Nothing indicated that the State of Georgia "affirmatively contemplated that the hospital authorities would displace competition by consolidating hospital ownership," *id.*, and so the first part of the *Midcal* test was not

satisfied. The Court had no occasion to consider the question of active supervision.

### III

This brief review reveals that there are several issues before us. First, we address the question whether the City would be entitled to state-action immunity if it had been the party sued by the plaintiffs. Second, we consider whether plaintiffs' decision to sue Chicago's lessee, CPM, makes any difference to the outcome. Third, we look at plaintiffs' argument that the City has retained such minimal control over CPM's operation of the Metered Parking System that the link between any state action and private action has been broken in a way that deprives CPM of the right to take advantage of the state-action shield. Finally, we touch on plaintiffs' complaint about the duration of the Agreement.

### A

As our review of the *Parker* doctrine as applied to municipalities indicates, the first question is whether the action at issue—the 75-year Concession—rested on clearly articulated and affirmatively expressed state policy. Even though Chicago is a home-rule city, see *About City Government & the Chicago City Council*, Office of the City Clerk, City of Chicago (last visited Mar. 9, 2023), https://www.chicityclerk.com/about-city-government-chicago-city-council, we know from *Community Communications* that the regulation in question must come directly from the State of Illinois, not the City.

Several Illinois laws, taken together, provide the authority for the state's municipalities to regulate parking. (We note that the state need not compel the allegedly anticompetitive activity; it is enough for the state policy expressly to permit

the conduct. See *So. Motor Carriers Rate Conference v. United States*, 471 U.S. 48, 61–62 (1985).) We begin with a simple law, 65 ILCS 5/11-80-2, which states that "[t]he corporate authorities of each municipality may regulate the use of the streets and other municipal property." The Metered Parking Spaces addressed by the Agreement are all on Chicago streets or other municipal property. Under this statute, the City has the power to dictate how those streets may be used—for parking, for loading zones, for bus lanes, and so forth. Similarly, Illinois law gives the City the authority to regulate the use of sidewalks, 65 ILCS 5/11-80-13, to the extent the sidewalks are relevant to street parking.

Most importantly, the City has broad authority to regulate parking pursuant to 65 ILCS 5/11-71-1. That statute appears under the heading "Off-Street Parking," but its language is not so limited. See *Michigan Ave. Nat'l Bank v. County of Cook*, 191 Ill.2d 493, 505–06 (2000) ("When the legislature enacts an official title or heading to accompany a statutory provision, that title or heading is considered only as a short-hand reference to the general subject matter involved in that statutory section, and cannot limit the plain meaning of the text.") (quotations omitted). Subpart (a) provides as follows in relevant part:

Any municipality is hereby authorized to:

(a) Acquire by purchase or otherwise, *own*, construct, equip, manage, *control*, erect, improve, extend, maintain and operate motor vehicle parking lot or lots, garage or garages constructed on, above and/or below ground level, public off-street parking facilities for motor vehicles, *parking meters*, and any other revenue producing facilities, hereafter referred to as parking

> facilities, necessary or incidental to the regulation, control and parking of motor vehicles, as the corporate authorities may from time to time find the necessity therefor exists, and for that purpose may acquire property of any and every kind or description, whether real, personal or mixed, by gift, purchase or otherwise.

65 ILCS 11-71-1(a) (emphases added). Nothing in this language indicates that the parking meters must be located in an off-street lot or garage. The meters are simply one device for producing revenue and controlling the parking of motor vehicles.

Subpart (b) of the same statute confirms the City's authority to "[m]aintain, improve, extend and operate any such parking facilities and charge for the use thereof." *Id.* § 11-71-1(b). Finally, subpart (c) states that municipalities may "[e]nter into contracts dealing in any manner with the objects and purposes of this [part of the Municipal Code], including the leasing of space on, or in connection with, parking meters for advertising purposes." *Id.* § 11-71-1(c).

But leases may exist for more than advertising purposes. Lest there be any doubt about the ability of the City to delegate its power to own and operate parking spaces to another entity, two more statutes answer any final questions. The first is 65 ILCS 5/11-71-8, which provides as follows:

> The corporate authorities of any such municipality availing of the provisions of this [part of the Illinois Municipal Code] are hereby given the authority to lease all or any part of any such parking facilities, and to fix and collect the rentals therefor, and to fix, charge and collect rentals, fees and charges to be paid for the

use of the whole or any part of any such parking facilities, and to make contracts for the operation and management of the same, and to provide for the use, management and operation of such lots through lease or by its own employees, or otherwise.

The only limitation on this authority is the requirement, spelled out in the statute, for a competitive bidding process and segregation of funds for leases with a term greater than one year. As noted earlier, the City did follow the prescribed procedures, and that aspect of the Concession is not at issue here.

Lastly, Illinois has a statute expressly directed at the *Parker* state-action exemption from the antitrust laws: 65 ILCS 5/1-1-10. It states broadly that it is the policy of the state that all powers granted to municipalities "may be exercised … notwithstanding effects on competition." *Id.* Included in the laws singled out by this statute is article 11 of the Illinois Municipal Code, which addresses corporate powers and functions of municipalities, including the parking rules. *Id.* § 1-1-10(b) (" … all of Divisions of Articles 10 and 11 of the Illinois Municipal Code … ."). Although the state obviously cannot obtain *Parker* protection simply by declaring that its system meets the Supreme Court's criteria for immunity, the state may take whatever steps it wishes to clarify that it is "clearly articulating and affirmatively expressing" its intention to regulate a certain area.

Plaintiffs argue that these laws do no more than the provisions of Georgia law regarding hospital acquisitions at issue in *Phoebe Putney*. As we noted, the Court there held that laws authorizing a special-purpose entity called a hospital authority to "acquire by purchase, lease, or otherwise" other

hospitals or medical facilities did not express any intent to displace competition in the market with state regulation. *Phoebe Putney*, 568 U.S. at 224, 227. But that is because it is easy to contemplate acquisitions or other property transfers that have no anticompetitive effect, and so there is nothing about that power that inevitably leads to anticompetitive outcomes. Moreover, nothing in the Georgia laws purported to confer exclusive ownership over the area's hospitals on the authorities. Thus, the fact pattern before the Court was not one in which "the displacement of competition was the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature." *Id.* at 229.

Chicago's metered parking places stand in an entirely different position. The City does not share the authority to regulate the use of the streets with anyone. See 65 ILCS 5/11-80-2. It thus may decide what to do with the streets: keep them open, carve out bike or bus lanes, establish zones exclusively for area residents, or provide metered parking. Illinois law gives the City a monopoly, to use plaintiffs' word, over those spaces. And plaintiffs seem to concede that if they had sued Chicago under the antitrust laws for its part in the Concession, they would have failed. The Illinois statutes we have discussed represent an affirmative decision at the state level to replace competition with regulation. There is no market in street parking places, and so there is no competition to be preserved.

## B

Our reasoning does not change simply because plaintiffs named CPM rather than the City as the defendant. The Supreme Court held as much in *Southern Motor Carriers*, when it said that "[t]he success of an antitrust action should depend

upon the activity challenged rather than the identity of the defendant." 471 U.S. at 58–59 (citation omitted). The Court specifically disapproved drawing any distinction between a case against a state agency and one against a private party as a named defendant. *Id.* at 58. Illinois law permits the City to exercise its powers through a lessee, and that is what Chicago has done. Or at least that is what Chicago says it has done. Plaintiffs counter that Chicago gave away so much authority in the Agreement that CPM is no longer acting under municipal supervision, and so it has lost the right to rely on *Parker* immunity. We now address that argument.

C

This issue—active supervision in the context of municipal regulation—did not arise in *Phoebe Putney*. We know from *Town of Hallie* that municipalities are not subject to the active supervision requirement. 471 U.S. at 45, 47. But that does not mean that anything goes when the state confers this kind of power on a municipality. The arrangement will be protected by *Hallie* if and only if the entity exercising the delegated state power is in fact the municipality itself. (Naturally, the municipality must do this through some kind of agent—employees, independent contractors, lessees, or the like.). If the municipality is only the nominal market regulator while a private entity actually exercises the power conferred by state law, *Hallie* immunity is not available. That follows from the Supreme Court's recognition that "where a private party is engaging in anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State." *N. Carolina Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 507 (2015) (quotation omitted). In other words, window dressing will not do.

*FTC v. Ticor Title Insurance Co.*, 504 U.S. 621 (1992), exemplifies this limit on state-action immunity. The Supreme Court examined whether title insurance companies in four states (Connecticut, Wisconsin, Arizona, and Montana) were entitled to state-action immunity in connection with the fixing of rates for search and examination services. *Id.* at 628. In each state, "the title insurance rating bureau was licensed by the State and authorized to establish joint rates for its members." *Id.* at 629. But the states used a "negative option" to approve those rate filings. They allowed rates that were established through agreements among private companies (that is, private price-fixing) to become effective if the state took no action within a specified time. The Court found that this system, which was used in Wisconsin and Montana, flunked the test for "active supervision" for *Parker* purposes. It held that "[a]ctual state involvement, not deference to private pricefixing arrangements under the general auspices of state law, is the precondition for immunity from federal law." *Id.* at 633.

With this in mind, we must ascertain whether the City is the entity determining the way the Metered Parking System will be operated, or if instead it ceded its authority to CPM, a private party, leaving CPM with the unfettered ability to pursue its own private ends. If the City is the true operator of the system, acting through CPM as an agent subject to City regulation and control, then the prerequisites for *Hallie* treatment exist. On the other hand, if, as in *Ticor*, the City gives away meaningful regulatory power to a private actor, then we do not have a case of municipal action, and *Parker* immunity will fail. As the Sixth Circuit put it, "the basic question in antitrust cases that involve municipal and private actors is whether the municipality or the private party made the effective decision that resulted in the challenged anticompetitive conduct."

*Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 537–38 (6th Cir. 2002). It explained how this relates to the *Midcal* analysis as follows:

> If the municipality or a municipal agent was the effective decision maker, then the private actor is entitled to state action immunity, regardless of state supervision. If the private actor was the effective decision maker, due to corruption of the decision-making process or delegation of decision-making authority, then it is not immune, unless it can show that it was actively supervised by the state.

*Id.* at 538; see also *Chamber of Commerce of the United States v. City of Seattle*, 890 F.3d 769, 788–89 (9th Cir. 2018) (*Hallie* framework not available in "a scenario in which the City authorizes collective price-fixing by private parties" who exercise discretion that is "far from trivial"); *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 477, 480 (2d Cir. 2009) (entity that is equivalent to a municipality must "maintain[] 'ultimate control' over the partial monopoly it created" in order for private parties to a contract to share in state action immunity).

The Ninth Circuit faced a similar problem in *Chamber of Commerce of the United States v. City of Seattle*. The court was asked to decide whether a Seattle ordinance authorizing rideshare drivers collectively to fix the prices for their services was immune from the antitrust laws. The district court dismissed a suit by the Chamber of Commerce and others that asserted that the ordinance violated federal antitrust and labor laws. In so doing, it relied on *Parker* immunity, and it held that the labor laws did not preempt the local ordinance. On appeal, the Ninth Circuit reversed the antitrust ruling. It held

that Seattle's ordinance did not rest on a *state* policy clearly articulating and affirmatively authorizing private parties to fix the prices for ride-referral services. *Chamber of Commerce*, 890 F.3d at 783, 787.

Although that would have been enough to dispose of the case, the court went on to address the active-supervision requirement imposed by *Midcal*, as modified by *Town of Hallie* for municipalities. Seattle's involvement, it reasoned, was too attenuated to qualify for the *Hallie* rule. As the court put it, "where, as here, state or municipal regulation by a *private* party is involved, active state supervision must be shown, even where a clearly articulated state policy exists." *Id.* at 788 (cleaned up) (emphasis added). It adopted this gloss on the *Hallie* rule in light of the concern that private parties—as opposed to municipalities—are likely to be motivated by self-interest, not the public interest. Significant delegation of regulatory powers to private parties carries with it the risk of abuse of market power, in the form of price-fixing, monopolistic pricing, or output restriction. The active supervision requirement, by requiring the state or municipality to bear final regulatory responsibility, assures that whatever impairment of competition occurs is done as a matter of conscious state policy.

It follows that if the municipality effectively regulates the monopoly and the private party is not free to pursue its own self-interest, the action qualifies as that of the municipality itself: it is the municipality, not the private actor, that is performing the functions delegated to it by state law. The policies and rules that are needed to further the relevant policy are in the control of the municipality.

Plaintiffs contend that their complaint portrays an arrangement under which the City of Chicago has entirely ceded its regulatory authority to the private entity CPM—that the City is nothing but CPM's puppet. If that were true, then just as in the Seattle case, the defendants would not qualify for state-action immunity, and we would need to reverse for further proceedings. But, as we now outline, our independent review of the Agreement satisfies us that Chicago has the power to regulate CPM's administration of the Metered Parking Spaces covered by the Concession.

The Agreement was itself an act of the City, pursuant to its powers to lease parking spaces and its authority to use a long-term instrument for that purpose. As required, the City invited private parties to bid; it indicated that it would not accept any bid under $1 billion; and it received bids from eight qualified entities. It negotiated the terms of the Concession with CPM, the winning bidder, and the City Council issued an ordinance approving the Agreement. See An Analysis of the Lease of the City's Parking Meters, *supra*, at 13–14. In short, the City chose to regulate by contract rather than by ordinance.

The Agreement is replete with provisions under which the City has reserved its police and regulatory powers. They include the following:

- Add or remove metered parking spaces, whether they are Concession Spaces or Reserve Spaces

- Collect revenue from newly added Reserve Spaces

- Set meter hours of operation and periods of stay

- Establish and revise parking fees

- Set all standards and policies applicable to the metered parking system

- Close streets for any reason

- Set amounts of fines for metered-parking violations; administer the adjudication system; and keep fine revenues

Although, as noted earlier, the City must compensate CPM for exercises of regulatory power that undermine the basis of the bargain, the Agreement has an internal mechanism that allows the City to mitigate the economic effects of the true-up payments. Specifically, it is entitled to add Reserve Spaces and collect 85% of the revenue they generate, and it can raise parking fees. The resulting revenue can be, and has been, used to support the true-up payments.

The breadth of the City's regulatory powers sets this case apart from *Ticor*. As noted, the *Ticor* Court deemed the state's "negative option" scheme insufficient for state involvement because the key question is "whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." 504 U.S. at 634–35. The Agreement here shows that the key actor is the City. Take meter rates for example, the focal point of plaintiffs' grievances. At the inception of the bidding process, the City gave "the qualified bidders a Confidential Information Memorandum ... that among other things set out a proposed schedule of meter rate increases that would be enacted as part of the lease. This meter rate schedule is nearly identical to the meter rates that were eventually approved by the City Council." An Analysis of the

Lease of the City's Parking Meters, *supra*, at 13–14. Critically, the City retained "the Reserved Power to establish and revise from time to time the Metered Parking Fees." Agreement § 7.1. Unlike the situation in *Ticor*, then, the City has the sole power to set the rates on its own initiative without regard to CPM.

Plaintiffs insist that these powers are essentially toothless because the financial impact of their exercise deters the City from using them. (They speak of the City's "paralysis" and the "impossibility" of meaningful regulation.) But, as the Illinois Appellate Court also recognized, "the City has, in fact, exercised its regulatory powers for the benefit of the public notwithstanding the Concession Agreement's compensation provisions." *Independent Voters*, 2014 IL App (1st) 123629 ¶ 81. For instance, the City increased the parking fees in 2020 through approval of that year's Revenue Ordinance. Parking Meter Rate Increase, City of Chicago (Feb. 24, 2021), available at https://311.chicago.gov/s/article/Parking-Meter-Rate-Increase?language=en_US.

The fact that the City pays a price for certain actions cannot be enough to undermine the whole Concession. No one would have wanted to sign an agreement that the City could gut the next day by (for example) cutting in half the number of covered parking spaces and trying at the same time to keep the full up-front payment. Regulation is possible even if the City must conduct a cost-benefit analysis before it takes a given step. If we were to accept plaintiffs' argument, we would essentially be making *Parker* immunity depend on whether the City increases or decreases its revenues over the lifespan of the Agreement. We cannot have a situation in which the antitrust laws are not violated if the City has

enough money to compensate CPM and decides to lower the metered rates, but they are violated if the City decides that the cost of compensation is too high and so refrains from taking a certain step.

We are satisfied that meaningful regulation exists under the Agreement and thus that nothing more in the way of active state supervision is necessary for *Parker* immunity. We conclude with a few words about one more argument plaintiffs raise.

### D

Plaintiffs are disturbed about the fact that the Agreement will run for 75 years, and that, as they calculate things, CPM has already recouped all of its start-up costs and stands to reap billions in "monopoly" profits for the next 60 years or so. But, aside from the fact that the Illinois Appellate Court has already found the 75-year term to be legal, see *Independent Voters*, 2014 IL App (1st) 123629, it is worth pointing out that there is nothing unique or suspicious about a long-term contract. Exclusive contracts for a long duration with private parties are nothing new in Chicago. Examples include water supply contracts authorized for a period not exceeding 101 years, 65 ILCS 5/11-135.5-25, and certain real estate leases that are permitted for a period not to exceed 99 years, 65 ILCS 5/11-135-6. They are permissible, so long as the City retains meaningful regulatory authority.

\* \* \*

It is easy to overlook the fact that the City derives benefits from these agreements, just as it pays a price. Although the metered parking spaces may be very expensive, the City also has a company that is maintaining them, upgrading them to

take advantage of cellphone and other technology, and handling payments. *Parker* immunity does not turn on whether, on balance, this was a good or a bad deal. All that matters is that it was one that was authorized by state law and that remains under the regulatory power of the City. We agree with the district court that state-action immunity applies here, and so we AFFIRM its judgment.